OPINION
{¶ 1} Defendants-appellants, Charley's Steakery, Inc. ("Charley's") and Gosh Enterprises, Inc. ("Gosh") (collectively "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas, granting preliminary injunctive relief in favor of plaintiff-appellee, Escape Enterprises, Ltd. ("Escape").
 {¶ 2} Escape is a franchisor of Steak Escape grilled steak sandwich franchise restaurants. Charley's is an operator of Charley's Grilled Subs restaurants and Gosh is a franchisor of Charley's Grilled Subs restaurants (formerly Charley's Steakery restaurants).
 {¶ 3} On January 21, 2004, Escape filed a complaint against appellants, containing the following allegations. Since 1988, Escape has extended franchise rights to its franchisee, Mall Enterprises, Inc. ("Mall Enterprises"), to operate a Steak Escape restaurant at the Tyrone Square Mall ("Tyrone Square"), located in St. Petersburg, Florida, and the University Mall ("University Mall"), located in Tampa, Florida. Escape's relationship with Mall Enterprises is governed by a franchise agreement, under which Mall Enterprises is prohibited from selling, assigning, transferring or encumbering the franchise agreement, the assets of the franchisee, or any other interest without obtaining Escape's prior written consent.
 {¶ 4} In 2002, Mall Enterprises began looking for a buyer for its Tyrone Square and University Mall franchises. On October 9, 2003, Mall Enterprises sent Escape a letter, advising Escape that it had received an offer by Gosh to purchase the Tyrone Square and University Mall restaurants. Escape informed its franchisee that it would not consent to the sale of the restaurants to appellants, its competitors. Escape also immediately informed appellants that the Tyrone Square and University Mall franchise agreements required Escape's consent to the proposed sale. Escape subsequently learned that appellants contacted and visited other Escape franchisees to induce them to sell their restaurants in violation of their franchise agreements. On January 5, 2004, without Escape's knowledge or consent, Mall Enterprises and appellants closed upon a sale of the Tyrone Square and University Mall restaurants.
 {¶ 5} Escape's complaint alleged causes of action for tortious interference with contract, unfair competition, civil conspiracy and fraudulent misrepresentation. Appellants filed an answer on February 18, 2004.
 {¶ 6} On June 9, 2004, Escape filed a motion for a temporary restraining order ("TRO") and preliminary injunction. In the accompanying memorandum in support, Escape raised concerns about matters not alleged in its complaint, but which Escape argued had come to light through discovery. More specifically, Escape asserted that certain discovery documents, coupled with information independently obtained, showed the likelihood appellants were currently negotiating to buy seven Steak Escape units, without Escape's consent, to convert them to Charley's Steakery restaurants.
 {¶ 7} Escape further alleged that the primary threat related to a series of complex transactions involving appellants, Escape's franchisee Giesen Restaurant Enterprises, LLC ("GRE"), GRE's principal, David Giesen ("Giesen"), Ciara Dawn, LLC ("Ciara"), an alleged apparent successor to GRE, and Charles Monfort, Ciara's principal. Escape asserted that appellants' responses to Escape's Interrogatory Nos. 1 and 3, as well as certain documents it produced, confirmed that appellants participated in an extended series of negotiations throughout 2003 with Giesen regarding the purchase of several of his Steak Escape units.
 {¶ 8} On July 14, 2004, the trial court granted in part and denied in part Escape's motion for a TRO. Specifically, the court ordered that appellants were precluded from engaging in any transaction to acquire the business of any Steak Escape restaurants, including, but not limited to, Escape units owned or operated by GRE or its successors, Giesen, Monfort and/or Ciara. The order was made valid until the preliminary injunction hearing set for July 23, 2004.
 {¶ 9} On July 22, 2004, Escape filed a memorandum in support of its motion for preliminary injunction. In the memorandum, Escape alleged that, subsequent to the filing of its complaint, information obtained through written discovery and depositions had confirmed its suspicions that appellants were involved in a widespread effort to purchase Steak Escape units in violation of Escape's franchise agreements.
 {¶ 10} More specifically, Escape alleged that, in addition to acquiring two Florida restaurants from Mall Enterprises, appellants had also acquired at least four Escape restaurants located in California from Escape's franchisee, GRE, and that Escape had obtained information that appellants were negotiating with Ciara to acquire some or all of the 33 Escape franchise restaurants that GRE formerly owned and operated, and which Ciara later acquired and was currently operating.
 {¶ 11} In its memorandum, Escape alleged the following facts. Monfort, Ciara's owner, became an Escape franchisee in 1998 through a corporation he formed named Melbourne. Melbourne and Escape executed a franchise agreement for a unit in Greeley, Colorado. Monfort eventually hired GRE's owner, Giesen, to run the Greeley unit. GRE was a significant Escape franchisee prior to the Greeley franchise agreement. Monfort subsequently assigned the Greeley unit to GRE pursuant to an assignment and assumption agreement entered between Melbourne, GRE and Escape.
 {¶ 12} GRE sought to expand its growth of Escape franchises, and, in 2000, it entered into a development agreement with Escape, whereby GRE committed to opening an additional 50 Escape restaurants over five years. In order to finance this growth, GRE approached Monfort and Ciara for financing. Ciara subsequently loaned approximately $16 million to GRE to finance the construction of additional Escape franchise locations. As a condition to making the loans, Monfort and Ciara requested that Escape consent to Ciara's right to take over all tangible and intangible assets from GRE in the event of a default. On March 29, 2000, Escape executed a "Franchisor's Consent to Lender's Rights" (hereafter "loan consent"), whereby it consented to Ciara exercising such rights in the event GRE should default on its obligations to Ciara.
 {¶ 13} In April of 2003, appellants and Giesen signed a confidentiality and nondisclosure agreement. Also during 2003, GRE sold appellants four Escape units located in California. In October 2003, Escape sent appellants a letter stating it was aware Charley's had contacted several of Escape's franchisees attempting to induce them to sell their Steak Escape units to Charley's. Escape contended that, in several instances, Escape's franchisees had completed such sales without obtaining Escape's consent or without offering Escape a right of first refusal as required by their franchise agreements. In the letter, Escape stated that its "standard Franchise Agreement with our Steak Escape Franchisees specifically provides that a Steak Escape Franchisee shall not sell or transfer `substantially all the assets of the Restaurant' * * * without our prior written consent," and that "[a]ny Steak Escape Franchisee who sells its Restaurant Assets without complying with these terms is violating the terms of its Steak Escape Franchise Agreement."
 {¶ 14} GRE subsequently began to experience difficulties fulfilling its loan obligations to Ciara, and, in August 2003, Monfort hired E. Mitchell Harber to review and oversee Ciara's GRE operations and finances. Monfort subsequently removed Giesen from management. After November 15, 2003, Harber was responsible for cutting checks and hiring and firing employees. According to Escape, at this point "Ciara's control over the 33 Units was complete," and it appeared to Escape that Ciara "had simply taken over GRE and there was no difference between the two companies."
 {¶ 15} Later in 2003, Ciara and Escape entered into negotiations to renegotiate the terms of the franchise agreements for the 33 units. Escape contended that, at the same time these negotiations were taking place and unbeknownst to it, Ciara's Monfort was negotiating with appellants to sell them four additional units in California (in addition to the four units appellants had already purchased).
 {¶ 16} In January of 2004, Ciara provided Escape with a copy of a letter of intent it entered into with GRE. Exhibit No. 3, attached to the letter of intent, provides in part that, at closing, Ciara will assume "[a]ll those GRE contracts and leases which directly related to the assets being transferred." In March 2004, Ciara and GRE entered into an "Agreement to Transfer Assets in Lieu of Repossession" (hereafter "transfer agreement"). The copy of the transfer agreement Escape obtained indicated that Ciara was assuming certain contracts from GRE, but Ciara failed to produce the schedule identifying the specific contracts being assumed. In its memorandum, Escape represented that it was in the process of filing a motion to compel and/or for contempt to compel Ciara to produce the schedule.
 {¶ 17} On May 5, 2004, Ciara's controller, Thomas Smerud, sent a letter to the vendors of the 33 units, informing them that the Giesen restaurants "have been combined into Ciara Dawn, LLC as of March 24, 2004." (Exhibit 15 attached to Harber Depo.) Escape alleged that, at this point, it believed Ciara had assumed the GRE franchise agreements because Monfort represented this in the letter of intent and had publicly given the appearance of this from having taken over the 33 units.
 {¶ 18} Escape also asserted that, shortly before it moved the trial court for the TRO, appellants had actually agreed to purchase four Escape restaurants located in Texas from Ciara for approximately $375,000, and that appellants were also meeting with Monfort and Harber to negotiate a separate deal for the purchase of 12 to 14 Escape restaurants located in Washington, Colorado, California and Arizona. Further, according to Escape, appellants' recent negotiations with Ciara also included the formation of a joint venture that could result in Monfort and Charley's acquiring all 33 Escape units and converting them to Charley's Steakeries.
 {¶ 19} By decision and entry filed on August 16, 2004, the trial court granted Escape's motion for preliminary injunction. The preliminary injunction precluded appellants from acquiring any Steak Escape restaurant owned or operated by GRE, Giesen, Monfort and/or Ciara.
 {¶ 20} On appeal, appellants set forth the following six assignments of error for review:
Assignment No. 1: The trial court committed clear error when it granted a Preliminary Injunction in favor of EEL without requiring proof of each element of its case by clear and convincing evidence.
Assignment No. 2: The trial court erred in finding that financing agreements between non-parties GRE and Ciara Dawn required Ciara Dawn to assume Plaintiff's-Appellee's franchise agreements with GRE in the event of an asset repossession by Ciara Dawn.
Assignment No. 3: The trial court erred when it found that franchise law does not require a written agreement between the franchisor and the franchisee.
Assignment No. 4: The trial court erred when it reversed the burden of proof by finding that "testimony is not sufficient to prove that Ciara Dawn did not assume the franchise agreements," when it was the burden of Plaintiff-Appellee to prove that such agreement [was] in fact assumed.
Assignment No. 5: The trial court erred in holding that nonparty Ciara Dawn's repossession of GRE's assets upon default subjected it to liability to Plaintiff-Appellee under GRE's franchise agreements.
Assignment No. 6. The trial court erred when it refused to consider the opinions of expert witnesses presented by Defendants-Appellants.
 {¶ 21} Appellants' six assignments of error, all raising issues as to whether the trial court erred in granting preliminary injunctive relief, are somewhat interrelated and will be discussed together.
 {¶ 22} In general, "[t]he purpose of a preliminary injunction is to preserve a status between the parties pending a trial on the merits."Proctor Gamble Co. v. Stoneham (2000), 140 Ohio App.3d 260, 267. Further, "[t]he right to an injunction must be clear and the proof thereof clear and convincing, and the right established by the strength of plaintiffs' own case rather than by any weakness of that of his adversary." White v. Long (1967), 12 Ohio App.2d 136, 140. A party requesting a preliminary injunction must ordinarily show that: "(1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction." Proctor Gamble, supra, at 267. A trial court's decision to grant a preliminary injunction is a matter within its discretion, and a reviewing court will not disturb the trial court's judgment in the absence of a clear abuse of discretion. Union Twp. v.Union Twp. Professional Firefighters' Local 3412 (Feb. 14, 2000), Clermont App. No. CA99-08-082.
 {¶ 23} Because appellants raise various challenges to the court's findings, including their contention that the court failed to apply the correct standard and to correctly analyze the arrangement under which Ciara took possession of collateral after GRE defaulted on its loan to Ciara, we begin with a summary of the court's factual findings and conclusions. The trial court initially noted that Escape's entitlement to injunctive relief was dependent upon whether it was likely to prevail on the merits of its claim for tortious interference with contract. Generally, "[a] claim of tortious interference with contract arises `when one party to a contract is induced to breach the contract by the malicious acts of a third person who is not a party to the contract.'"Charter Broadcast Group, Ltd. v. K-Country, Inc., Ashland App. No. 04-COA-033, 2005-Ohio-168, at ¶ 30. The elements of a cause of action for tortious interference with a contract are: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Kenty v. Transamerica PremiumIns. Co. (1995), 72 Ohio St.3d 415, 419.
 {¶ 24} In considering the first element of a tortious interference claim, i.e., the existence of a contract, the trial court observed that the "most straightforward method of proof would be to show that Ciara Dawn assumed the franchise agreements that Escape had with GRE." The court further noted, however, that to date GRE and Ciara had refused to provide Escape, through discovery, "certain highly relevant schedules to the `Agreement to Transfer Assets in Lieu of Repossession' by which GRE transferred the bulk of its assets associated with its Steak Escape restaurants to Ciara Dawn." On this point, the court was "not aware of any good reason why the discovery has not been provided," but that the situation "is unfairly prejudicial to Escape."
 {¶ 25} As noted by the trial court, relevant schedules to the transfer agreement were not included in the materials submitted as part of discovery. The court determined, however, that Escape had proven likelihood of success on the merits based in part upon the significant likelihood Ciara directly assumed the franchise agreements by way of the asset transfer agreement. More specifically, the trial court's discussion as to this factor for injunctive relief included the following findings:
* * * [T]here is a reasonable likelihood that Ciara Dawn did assume the franchise agreements. Both parties to the asset transfer agreement had motives for insuring that Ciara Dawn assumed the franchise agreements. The franchise agreements required that GRE obtain Escape's consent before encumbering or transferring any of the restaurant's assets and before transferring the franchise agreement. The only consent ever given by Escape was set forth in the March 29, 2000, "Franchisor's Consent to Lender's Rights." The only thing that Escape consented to was Ciara Dawn's right to assume the "rights and obligations under the franchise agreements" in the event of default by GRE. Arguably, that consent also allowed that Ciara Dawn could have a right to acquire GRE's other Steak Escape assets simultaneously with assuming the franchise agreements. However, the consent given by Escape certainly did not extend so far as to allow Ciara Dawn the right to acquire GRE's assets without simultaneously assuming the franchise agreements. Thus, Escape never gave its consent to the remedies provided for in the financing agreement, which included all remedies available under the UCC. Thus, it appears that GRE breached the franchise agreements when it allowed Ciara Dawn to encumber its assets in a manner not consented to by Escape.
So long as GRE did not default, and Ciara did not exercise its repossession remedy independently of assuming the franchise agreement, Escape had no damages and was unlikely to sue because of the breach. But once GRE defaulted, GRE could avoid liability only if Ciara acted in accordance with the consent extended by Escape. Thus, in the negotiations leading up to the asset transfer agreement, GRE would have been motivated to seek transfer of the franchise agreements to Ciara.
 {¶ 26} The court found that "GRE would have breached the finance agreements a second time if it agreed to transfer its assets to Ciara without Escape's consent." On this point, the court held that, because Escape "arguably already consented to a transfer of assets simultaneously accompanied with a transfer of the franchise agreement, the second breach could be avoided by seeking to have the franchise agreements transferred to Ciara." Thus, the court concluded, GRE would have been "motivated for that reason as well" to negotiate for assumption of the franchise agreements by Ciara.
 {¶ 27} The court found that Ciara also had a motive to negotiate for its assumption of the franchise agreements. Specifically, the court held that, when Ciara "completely took over the day to day management of the restaurants, it stepped out of the traditional role of lender protecting its collateral, and subjected itself to potential liability" under a line of cases in which courts have held that "lenders can be held liable where their control over the debtor's business has become pervasive and has been misused so as to cause injustice or perpetrate a fraud." The trial court noted that an "injustice" or "misuse" might easily be found in circumstances where a lender "fails to exercise its control over the debtor so as to insure the debtor's compliance with its obligations to innocent third parties," and that Ciara would have been motivated to insure that the asset transfer agreement would not transfer assets to it in a manner that breached GRE's contractual obligations to Escape.
 {¶ 28} The trial court made the following additional findings on the issue of the likelihood Escape would prevail:
* * * [T]he evidence suggests that Ciara's original intention was to assume the franchise agreements. When Ciara originally sought Escape's consent to its default remedies, it only sought consent to assume GRE's rights and obligations under the franchise agreements. It did not seek Escape's consent for an independent right to repossess the assets without assuming the franchise agreement. Thus, Ciara's conduct implied to Escape that its intention in the event of default was to assume the franchise agreements rather than merely repossess the assets without simultaneously assuming the franchise agreements.
After default occurred, Ciara continued to indicate an intention to assume the franchise agreements. It sent a copy of a letter of intent to Escape in which Ciara stated its conditional intent to assume the franchise agreements. While the intent stated therein was conditional, there was no reason to believe that Ciara would seek to repossess the assets of GRE without assuming the franchise agreements since Ciara's earlier conduct had implied an intent to limit itself to the remedy of assuming the rights and obligations under the franchise agreements. Even two months after the asset transfer agreement had been signed, Mr. Harber, Ciara Dawn's lead person managing the restaurants, wrote a draft of a letter that recognized Escape's right of refusal as provided for in the franchise agreements. It was only at that time that he learned from someone else at Ciara that Ciara no longer intended to recognize that right of refusal. * * *
 {¶ 29} Based upon the above findings, the trial court concluded, "there is some significant likelihood that Ciara assumed the franchise agreements by way of the asset transfer agreement." The court further found "a sufficient likelihood that Escape can succeed on the merits even if the asset transfer agreement does not transfer the franchise agreements to Ciara" based upon Escape's "implied assumption" theory. Specifically, the court held that, apart from the significance of the transfer agreement itself, "there is still a sufficient likelihood that Escape can prove that it was reasonable for Escape to rely upon Ciara's implied representation * * * that Ciara was intending to limit its remedies in the event of default to an option to assume the franchise agreements."
 {¶ 30} Upon review, we do not find that the trial court abused its discretion in its determination that Escape made a substantial showing of likelihood of success on the merits. Appellants' primary contention is that a tortious interference claim cannot be successful because Escape has failed to demonstrate that Ciara and Escape ever entered into a franchise agreement; rather, it is contended, Ciara was merely exercising its options as a repossessing secured creditor. We have outlined above the trial court's findings regarding evidence as to whether Ciara directly assumed GRE's contractual obligations under the franchise agreements. In the event Ciara assumed GRE's obligations, and is therefore bound by Escape's franchise agreement with GRE, evidence that appellants induced Escape's franchisees to breach an agreement requiring Escape's consent to a sale or transfer to sell their units would give rise to liability under a theory of tortious interference.
 {¶ 31} Appellants argue that the trial court erred in finding that financing agreements between GRE and Ciara "required" Ciara to assume Escape's franchise agreements with GRE in the event of an asset repossession. In response, Escape maintains that the trial court made no such finding, and we agree. As noted by Escape, the trial court's finding that Escape is likely to prevail on the issue of assignment is based primarily on the likelihood that GRE actually assigned the Escape units to Ciara via the transfer agreement.
 {¶ 32} Section 1 of the transfer agreement entered between Ciara and GRE sets forth provisions for "Acquired and Excluded Assets; Assumed and Excluded Liabilities." Paragraph 1.1(d), pertaining to "Contracts," states as follows:
1.1. Acquired Assets.
On the terms and subject to the conditions of this Agreement, and except as provided in Section 1.2, Debtors shall transfer, convey and assign (or cause to be transferred, conveyed and assigned) to Ciara Dawn, at the Closing, and Ciara Dawn shall acquire from Debtors, all right, title and interest in and to all of the Acquired Assets (as defined below) free and clear of all loans, encumbrances and security interests, except as expressly set forth herein. The "Acquired Assets" shall mean all right, title and interest in and to all of Debtors' assets, properties, rights of any kind, whether tangible or intangible, real or personal, that constitute or that are used in, needed for the conduct of or Material to, or that otherwise relate in any Material respect to the Acquired Business or are or were used in or useful to the Acquired Business, including, but not limited to, all right, title and interest in and to the following assets of Debtors:
* * *
(d) Contracts: All those Debtor Contracts which are effectively assigned and transferred to the Creditor hereby as part of the Acquired Assets pursuant to a Bill of Sale and Assignment and Assumption Agreement in substantially the form of Exhibit B attached hereto (the "Assignment and Assumption Agreement"), all of which are set forth on Schedule1.1(d) (the "Assumed Contracts")[.]
 {¶ 33} Section 1.2 of the transfer agreement contains a provision for "Excluded Assets," and states in part: "Anything contained in this Agreement to the contrary notwithstanding, there are expressly excluded from the Acquired Assets those assets, properties and rights set forth onSchedule 1.2."
 {¶ 34} While the trial court was hindered by Ciara's failure to come forward with pertinent discovery materials that would bear on the issue of which franchise agreements had been assigned, including the pertinent schedules referenced above, we find no abuse of discretion by the court in finding there exists a reasonable likelihood Ciara directly assumed the agreements.
 {¶ 35} We also disagree with appellants' claim that the trial court erroneously found that franchise law does not require a written agreement between a franchisor and franchisee. The court specifically held that Escape "must show that Ciara Dawn has a contractual obligation owed to Escape that would be breached if Ciara Dawn sold the restaurants to Charley's." The court further noted, "[t]here is a written agreement[,]" but the franchise agreement "does not require that it be rewritten upon assumption by a new party." Thus, the court nowhere held that written franchise agreements are unnecessary, but merely recognized that, in the event Ciara expressly assumed the franchise agreements by way of the asset transfer agreement, Ciara, as assignee, would step into the shoes of GRE, and would succeed to GRE's obligations under the franchise agreement with Escape. See Citizens Fed. Bank, F.S.B. v. Brickler
(1996), 114 Ohio App.3d 401, 410 (where assignee assumes assignor's obligations, assignee stands in the shoes of the assignor and takes contract with all rights of the assignor and subject to all defenses obligor may have had against the assignor).
 {¶ 36} Appellants further contend that the court erred in finding that certain testimony was insufficient to prove Ciara did not assume the franchise agreements. The trial court's finding was in response to appellants' contention that the lack of discovery regarding the relevant schedules was not prejudicial because, they argued, the deposition testimony of Monfort and Harber established that Ciara did not assume the franchise agreements.
 {¶ 37} The trial court rejected appellants' contention, initially noting that the issue as to "whether the transfer agreement transferred the franchise agreements to Ciara Dawn is a legal question rather than a factual question," and, therefore, is more properly decided by the court. Further, the court found Monfort's testimony less than helpful, noting that "he is not particularly attentive to the terms of Ciara Dawn's contracts," leaving the review of those matters to his lawyers. As to Harber's testimony that he did not "think" the Escape franchise agreements were listed on the schedules, the court noted that the language of the transfer agreement was "somewhat confusing," and that any belief by Harber that the franchise agreements were not assumed might be attributed to Harber misconstruing the significance of Schedule 1.1(d).
 {¶ 38} We do not find that the court's discussion of the deposition testimony at issue amounted to a reversal of the burden of proof, and we agree with the court that any interpretation as to the terms of the transfer agreement was a question of law for the court, not a matter to be determined by lay testimony. Again, although the relevant schedules were not produced during the depositions; the evidence before the trial court included a copy of the transfer agreement indicating that certain contracts were assigned. Moreover, in light of evidence, as noted by the trial court, that Ciara Dawn "completely took over the day to day management of the restaurants," the court was not required to accept the statements of Monfort and Harber.
 {¶ 39} Appellants' argument under the fifth assignment of error is terse. Appellants argue that the trial court erroneously accepted Escape's position that Ciara Dawn "ipso facto" became a franchisee of Escape by virtue of Ciara Dawn's exercise of its rights as a lender. Although not specifically stated in their brief, appellants appear to challenge the trial court's finding that, when Ciara took over the day-to-day management of the restaurants, "it stepped out of the traditional role of lender protecting its collateral, and subjected itself to potential liability." In support, the trial court cited KrivoIndus. Supply Co. v. National Distillers Chemical Corp. (C.A.5, 1973), 483 F.2d 1098, a case in which that court discussed lender liability under an "instrumentality" rule. Specifically, the Krivo court held that the "control required for liability under the `instrumentality' rule amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." Id. at 1106.
 {¶ 40} We are unaware of any Ohio cases applying an instrumentality theory in the context of lender liability. However, even were we to disagree with the trial court's reliance upon that theory, we still find no abuse of discretion by the court in finding, alternatively, a substantial likelihood that Ciara expressly assumed the obligations of GRE by accepting, by way of the transfer agreement, assignment of the contracts.
 {¶ 41} Appellants further maintain that the trial court erred in refusing to consider the opinions of its expert witnesses, John F. Dienelt and James E. Meeks, who were deposed as part of the evidence. We disagree.
 {¶ 42} The record indicates that the court, in its decision, denied Escape's motion to strike the testimony of appellants' expert witnesses, but did not consider the legal opinions offered. More specifically, the court held that, because "the factual testimony of the expert witnesses at issue is intertwined with their legal opinions, this Court will disregard the legal opinions rather than strike the entire testimony."
 {¶ 43} We find no error by the trial court. Under Ohio law, "an expert's interpretation of the law should not be permitted, as that is within the sole province of the court." Wagenheim v. Alexander Grant Co. (1983), 19 Ohio App.3d 7, 19. Here, the determination as to the significance of the terms of the transfer agreement between GRE and Ciara, and the likelihood of a contractual commitment between Escape and Ciara based upon that agreement, presented a question of law for the court.
 {¶ 44} In considering the factors for preliminary injunctive relief, the trial court also addressed the threatened harm to Escape if the status quo is not preserved, as compared to the harm of appellants and Ciara if they are requested to wait until after the trial to proceed with their transaction. The court noted that "Escape and Charley's compete for a limited number of shopping center locations, and the strength of their respective businesses is to some considerable extent dependent upon their success in acquiring and holding on to those locations." Further, noting evidence that appellants might acquire as many as 33 of Escape's locations if appellants are allowed to proceed with purchasing the Steak Escape restaurants from Ciara, the court found this acquisition involved "a very significant percentage" of Escape's business. In contrast, the court found that appellants had not adequately argued that there was a likelihood it might lose its opportunity to purchase the restaurants if required to wait, or that there is a likelihood Ciara would lose its opportunity to sell for a comparable price if not allowed to immediately sell to appellants. Thus, the trial court found that "this factor weighs heavily in favor" of Escape's entitlement to the injunction.
 {¶ 45} In addition to comparing the potential harm to Escape with the potential harm to appellants if injunctive relief is granted, the trial court also addressed appellants' argument that any finding of an implied contract might unjustifiably harm a third party, Ciara, since any decision would deprive it, as a non-party, of its right to defend its interests. The trial court found, however, that there was no basis to believe that the court's findings would be res judicata as to Ciara.
 {¶ 46} We agree with the trial court that the threatened harm to Escape outweighs the threatened harm to appellants and Ciara, and that the facts of this case favor preservation of the status quo. As noted by the court, the loss of 33 restaurants represents a substantial percentage of Escape's existing units, and Escape has demonstrated imminent injury to its business if the relief is not granted. See Tom Doherty Associatesv. Saban Entertainment, Inc. (C.A.2, 1995), 60 F.3d 27, 37 (finding irreparable harm "where a party is threatened with the loss of a business"); Progressive Restaurant Systems, Inc. v. Wendy's Intern.,Inc. (N.D.N.Y. 1990), 17 Fed.R.Serv.3d 786 (threat of loss of party's franchise business constituted irreparable harm).
 {¶ 47} We note that the trial court did not make specific findings as to the fourth factor under the test for a preliminary injunction, i.e., whether the public interest would be served by issuing the injunction. While we believe the trial court should have expressly discussed this factor, we do not find this omission to mandate reversal per se. SeeGateway Eastern Ry. Co. v. Terminal R.R. Assoc. of St. Louis (C.A.7, 1994), 35 F.3d 1134, 1139, fn. 3 (affirming district court's granting of injunction despite court's failure to explicitly address public interest factor; "because we are concerned primarily that issuance of the injunction will not disserve (as opposed to serve) the public interests * * * we do not believe this factor affects the above analysis"). Based upon the record presented in the instant case, the trial court could have reasonably concluded that, to the extent the public was involved, there was no strong public interest against Escape's request for such relief; rather, there is a benefit to enforcement of contractual relations.Blakeman's Valley Office Equip., Inc. v. Bierdeman, 152 Ohio App.3d 86,2003-Ohio-1074, at ¶ 39 ("Preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest.").
 {¶ 48} In support of their contention that the trial court applied an incorrect standard, appellants cite portions of the trial court's decision, including language by the court that "clear and convincing evidence that one factor weighs very heavily in favor of the injunction may negate the need for clear and convincing evidence as to one or more of the other factors." The trial court, however, appears to have been merely referencing accepted Ohio law, in which courts have recognized, in determining whether to grant injunctive relief, that the factors "must be balanced," and that "no one factor is dispositive." Cleveland v.Cleveland Elec. Illum. Co. (1996), 115 Ohio App.3d 1, 14. Thus, it has been held that "[w]hen there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though a plaintiff's case of irreparable injury may be weak." Id. See, also, Rothv. Bank of Commonwealth (C.A.6, 1978), 583 F.2d 527, 538 ("In general, the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction. * * * A balancing is required, and not the mechanical application of a certain form of words.").
 {¶ 49} Furthermore, while the trial court made reference, as noted above, to balancing the factors, we do not construe the trial court's decision as finding either a slight showing of likelihood of success or of irreparable harm. Rather, the court found, in considering the likelihood of success and the need to preserve the status quo, Escape showed "clearly and convincingly" that it was entitled to preliminary injunctive relief. Accordingly, we find no merit to appellants' claim that the trial court applied an incorrect standard.
 {¶ 50} Based upon the foregoing, appellants' six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Lazarus and Klatt, JJ., concur.