[Cite as *AIDS Taskforce of Greater Cleveland v. Ohio Dept. of Health*, 2018-Ohio-2727.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105971**

**AIDS TASKFORCE OF GREATER CLEVELAND**

PLAINTIFF-APPELLANT

vs.

**OHIO DEPARTMENT OF HEALTH, ET AL.**

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-17-877839

**BEFORE:** McCormack, P.J., Jones, J., and Keough, J.

**RELEASED AND JOURNALIZED:** July 12, 2018

**ATTORNEYS FOR APPELLANT**

Robert A. Zimmerman
Benesch, Friedlander, Coplan & Arnoff, L.L.P.
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

Arti L. Bhimani
Courtney N. Conner
6255 West Sunset Blvd., 21st Floor
Los Angeles, CA 90028

Steven A. Oldham
Mark D. Tucker
Benesch, Friedlander, Coplan & Arnoff, L.L.P.
41 South High Street, Suite 2600
Columbus, OH 43215


**ATTORNEYS FOR APPELLEES**

**For Ohio Department of Health**

Mike DeWine
Ohio Attorney General
Henry G. Appel
Principal Assistant Attorney General
Deborah Anne Enck
Ohio Attorney General Executive
30 East Broad Street, 26th Floor
Columbus, OH 43215

**For Equitas Health, Inc.**

Patricia A. Geraghty
Brennan, Manna & Diamond, L.L.C.
75 East Market Street
Akron, OH 43085

David M. Scott
250 Civic Center Drive, Ste. 300
Columbus, OH 43215

**For MetroHealth System**

Marlene L. Franklin
Laura C. McBride
MetroHealth Medical Center
2500 Metrohealth Drive
Cleveland, OH 44109

**For Nueva Luz Urban Resource Center**

Patrick Espinosa
Lorenzow Law, L.L.C.
5005 Rockside Rd., Suite 600
Independence, OH 44131

TIM McCORMACK, P.J.:

{¶1} Plaintiff-appellant AIDS Taskforce of Greater Cleveland ("AIDS Taskforce" or "the Taskforce") appeals from a judgment of the trial court denying its motion for a preliminary injunction. For the following reasons, we affirm.

## I. Background and Procedural History

{¶2} The Ryan White Comprehensive AIDS Resources Emergency Act of 1990 ("Ryan White Act") was authorized by Pub.L. No. 101-381, 104 Stat. 576 (Aug. 18, 1990), and codified at 42 U.S.C. 300ff et seq. The purpose of the federal Act is

> to provide emergency assistance to localities that are disproportionately affected
> by the Human Immunodeficiency Virus epidemic and to make financial assistance
> available to States and other public or private nonprofit entities to provide for the
> development, organization, coordination and operation of more effective and cost
> efficient systems for the delivery of essential services to individuals and families
> with HIV disease.

42 U.S.C. 300ff.

{¶3} The Ryan White Act distributes funding to the states through the establishment of various programs of grants, such as the Part B program, which is the subject of this appeal. The purpose of the Part B program is to "enable * * * states to improve the quality, availability and organization of health care and support services for individuals and families with HIV/AIDS." 42 U.S.C. 300ff-21. Part B funds are administered by the director of health under division (D) of section 3701.241 of the Revised Code. Ohio Adm.Code 3701-44-01.

{¶4} AIDS Taskforce is a 501(c)(3) tax-exempt organization that provides services and support to individuals in the greater Cleveland area who are living with HIV/AIDS. Some of

these services include: assisting with basic nutrition needs, facilitating group therapy, providing supportive services at housing facilities, assisting with access to government rent and utility assistance, and providing meals. The Taskforce has served Cuyahoga County and the greater Cleveland metro area for approximately three decades and is the longest serving AIDS service organization in Ohio. The majority of the Taskforce's clients are African-American or Latino, and they live at or under the federal poverty level. For approximately 25 years, the Taskforce has been the recipient of federal funding provided by grants awarded through the Ryan White Act. The Taskforce has used the Ryan White "Part B" funds to cover the costs associated with its HIV/AIDS health care and support.

{¶5} The Ohio Department of Health ("ODH") is a cabinet-level agency, the "pass-through entity," charged with the task of administering the federal Ryan White Act funds to local nonprofit organizations, area "subrecipients," through a competitive grant application process. The subrecipients include appellant AIDS Taskforce and The MetroHealth System ("MetroHealth"), Equitas Health, Inc. ("Equitas"), and Nueva Luz Urban Resource Center ("Nueva Luz" or "Proyecto Luz"). The entities interested in receiving Part B funds must submit an application for the funds pursuant to ODH's Request for Proposal ("RFP") criteria.

{¶6} On or about November 1, 2016, ODH issued the RFP for Part B funding. The RFP was for the 2017-2020 grant cycle, with the fiscal year beginning April 1, 2017, and ending March 31, 2018. It included criteria for the grant award. The applications became due in December 2016 for this three-year grant cycle. On December 16, 2016, the Taskforce applied for the 2017-2020 Ryan White Act, Part B grant cycle in the amount of $559,681. The requested funds would be used to assist the Taskforce in maintaining a comprehensive continuum of care for its HIV/AIDS clients through case management services. Specifically,

the funds would be used to cover the costs of seven case managers, a case aide, and a supervisor.

**{¶7}** On or about March 7, 2017, the ODH denied the Taskforce's application for Part B funds. ODH approved awards of $355,390 to MetroHealth, $579,936 to Nueva Luz, and $6,261,592 to Equitas.

**{¶8}** On March 24, 2017, AIDS Taskforce filed a complaint for a temporary restraining order, preliminary injunction, and declaratory judgment against ODH. The complaint sought to enjoin ODH from disbursing grant funding under Part B of the Ryan White Act. It also sought declaratory judgment from the trial court that ODH abused its discretion in denying the Taskforce's application for Part B funds. The court issued a temporary restraining order and scheduled the matter for a hearing on the preliminary injunction. Thereafter, the court granted ODH's motion to join necessary parties MetroHealth, Equitas, and Nueva Luz, finding these entities have an interest in the specific grant funding that is the subject matter of the declaratory judgment action and injunction.

**{¶9}** On May 15, 2017, the court held a hearing on AIDS Taskforce's motion for preliminary injunction. Following the hearing, the trial court denied the Taskforce's motion, finding that the Taskforce had not established by clear and convincing evidence the elements necessary to obtain injunctive relief; the Taskforce's injury did not outweigh any potential injury to the community if the preliminary injunction was granted; and the Taskforce had not established that ODH committed fraud or abused its discretion in awarding funding to other organizations, "as no evidence was presented that ODH acted in bad faith or with an unreasonable, arbitrary, or unconscionable attitude."

**{¶10}** AIDS Taskforce now appeals the trial court's denial of its motion for preliminary injunction, assigning four errors for our review, which we will address together:

> I.    The trial court abused its discretion by denying the motion for preliminary injunction of AIDS Taskforce because it did not consider federal statutes and regulations applicable to ODH's decision to deny renewal of AIDS Taskforce's contract for federal Ryan White Act, Part B funds.
> II.   The trial court abused its discretion by denying the motion for preliminary injunction of AIDS Taskforce because it did not consider ODH's disparate treatment of AIDS Taskforce and Appellees Nueva Luz, MetroHealth, and Equitas with respect to their "compliance" with grant requirements.
>
> III.  The trial court abused its discretion by denying the motion for preliminary injunction of AIDS Taskforce because it did not consider the evidence that AIDS Taskforce patients have remained with AIDS Taskforce and funding allocated to Nueva Luz, MetroHealth, and Equitas will therefore go unused.
>
> IV.   The trial court abused its discretion by denying the motion for preliminary injunction of AIDS Taskforce because it did not consider patient choice and evidence that patients will fall out of care because of ODH's arbitrary decision to deny AIDS Taskforce's application for Ryan White Act, Part B funding.

## II.    Final Appealable Order

**{¶11}** Before addressing the merits of the Taskforce's argument, we must determine whether there is a final, appealable order.    Appellees ODH, Equitas, and Nueva Luz jointly filed a motion to dismiss the appeal, arguing that a preliminary injunction is ordinarily not a final, appealable order and the preliminary injunction in this case does not fall within the purview of R.C. 2505.02(B)(4).[1]    Specifically, the appellees contend that the AIDS Taskforce has failed to demonstrate that it lacks a meaningful or effective remedy by appealing a final judgment as to all

---

[1]  The record shows that two motions to dismiss were filed with this court on July 7, 2017: (1) joint motion of defendant-appellee Equitas to dismiss; and (2) motion of defendant-appellees ODH, Equitas, and Nueva Luz to dismiss.    Both motions contend the trial court's order denying the preliminary injunction is not a final, appealable order and will be addressed together.

issues and causes of action. The Taskforce opposes the motion, arguing that it would not be afforded a meaningful or effective remedy because the particular funds at issue will be exhausted or unavailable before the trial court renders final judgment.

{¶12} A preliminary injunction is a provisional remedy. *E. Cleveland Firefighters, IAFF Local 500 v. E. Cleveland*, 8th Dist. Cuyahoga No. 88273, 2007-Ohio-1447, ¶ 2, citing R.C. 2505.02(A)(3). Therefore, an order denying a preliminary injunction will be a final, appealable order only where

> (a) the order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy; and

> (b) the appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.

*Id.*, citing R.C. 2505.02(B)(4); *see also Clean Energy Future, L.L.C. v. Clean Energy Future-Lordstown, L.L.C.*, 11th Dist. Trumbull No. 2017-T-0110, 2017-Ohio-9350, ¶ 4 (the circumstances of each case dictate whether the granting or denial of a preliminary injunction is a final appealable order).

{¶13} The parties concede that the first prong of R.C. 2505.02(B)(4) is satisfied because a preliminary injunction is a provisional remedy under R.C. 2505.02(A)(3) and the trial court denied the motion for preliminary injunction. The issue in this matter, therefore, is the second prong: whether AIDS Taskforce would be deprived of a meaningful or effective remedy if it cannot appeal the trial court's denial of its motion for preliminary injunction now.

{¶14} In considering whether a party has satisfied R.C. 2505.02(B)(4)(b), the Ohio Supreme Court has stated that in some instances, a party seeking an appeal from an interlocutory order would have no adequate remedy where "'the proverbial bell cannot be unrung and an

appeal after final judgment on the merits will not rectify the damage' suffered by the appealing party." *State v. Muncie*, 91 Ohio St.3d 440, 451, 2001-Ohio-93, 746 N.E.2d 1092, quoting *Gibson-Myers & Assocs. v. Pearce*, 9th Dist. Summit No. 19358, 1999 Ohio App. LEXIS 5010, 2 (Oct. 27, 1999). For instance, where an appealing party argued that a trial court's order would require the party to spend funds that would not be recovered, the Ohio Supreme Court stated that "[w]aiting until the end of litigation before allowing appeal of this provisional order does not provide the remedy of restoring funds that might have been used otherwise. Such an appeal would be neither meaningful nor effective, even if the appellants prevail on the merits of the case." *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, 876 N.E.2d 1217, ¶ 25.

{¶15} Here, at issue is federal Ryan White Act, Part B funds in the amount of $559,681, for which the AIDS Taskforce has applied and been denied. The Taskforce argues that it will be denied an effective remedy if the case proceeds to final judgment because the funds at issue are unique funds that are awarded on an annual basis and they cannot be replaced once they been distributed.

{¶16} Generally, where a party would be entitled to monetary damages for any loss suffered from a preliminary injunction, there is no right to an immediate appeal from a ruling on a preliminary injunction. *Cleveland Clinic Found. v. Orange Technologies, L.L.C.*, 8th Dist. Cuyahoga Nos. 100011 and 100059, 2014-Ohio-211, ¶ 14, citing *Wells Fargo Ins. Servs. USA v. Gingrich*, 12th Dist. Butler No. CA2011-05-085, 2012-Ohio-677, ¶ 13.

{¶17} In this case, however, the Ryan White Act, Part B funds central to this case are particular funds that are awarded to applicants for the 2017-2020 grant cycle. After denying the AIDS Taskforce's application for these funds, the ODH determined that the $559,681 Part B

funds for which the Taskforce applied and was denied would be distributed to Metro, Equitas, and Nueva Luz during this grant cycle. If the AIDS Taskforce is prevented from immediately appealing the court's denial of its preliminary injunction, the Part B funds for which the Taskforce has applied and been denied will likely be distributed by the ODH to the appellee organizations before the trial court renders its final judgment. As such, the Part B funds will have been exhausted. Moreover, there is no evidence that the federal program will make additional funds available in the future. And even if the Taskforce ultimately prevails on its claim for declaratory judgment, such a declaration that the ODH was in error in denying the Taskforce the Part B funds lacks any meaning or effectiveness if the funds no longer exist.

{¶18} Accordingly, based on the facts and circumstances of this case, we find that the AIDS Taskforce would essentially be deprived of a meaningful and effective remedy by an appeal following final judgment, thus satisfying the second prong of R.C. 2505.02(B)(4). The trial court's order denying the AIDS Taskforce's motion for a preliminary injunction is therefore a final, appealable order, and the appellees' motions to dismiss are denied.

### III. Preliminary Injunction

{¶19} Appellant argues that the trial court erred when it denied the Taskforce's motion for preliminary injunction because the court failed to consider applicable federal law governing ODH's decision to deny the Taskforce's grant application; it did not consider ODH's disparate treatment of the Taskforce and the appellee entities; it did not consider evidence that AIDS Taskforce patients have remained with AIDS Taskforce and funding allocated to the other entities will go unused; and it did not consider patient choice and evidence that patients will fall out of care.

{¶20} We note initially that an injunction is an extraordinary remedy in equity where there is no adequate remedy at law. *Garono v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). And a decision to grant or deny an injunction depends upon "the character of the case, the particular facts involved, and factors relating to public policy and convenience." *Cementech, Inc. v. Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, 849 N.E.2d 24, ¶ 10, citing *Perkins v. Quaker City*, 165 Ohio St. 120, 125, 133 N.E.2d 595 (1956). Thus, if the allowance of an injunction would be inequitable or unjust, it may be denied. *Perkins*. "Courts should take 'particular caution * * * in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government.'" *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 604, 653 N.E.2d 646 (1995), quoting *Leaseway Distrib. Ctrs., Inc. v. Dept. of Adm. Serv.*, 49 Ohio App.3d 99, 106, 550 N.E.2d 955 (10th Dist.1988).

{¶21} The decision to grant or deny an injunction is solely within the trial court's discretion and a reviewing court should therefore not disturb the judgment of the trial court absent an abuse of that discretion. *Kyrkos v. Superior Beverage Group, Ltd.*, 8th Dist. Cuyahoga No. 99444, 2013-Ohio-4597, ¶ 13, citing *Garono* at 173.

{¶22} A party requesting a preliminary injunction must show that: (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction. *Kyrkos* at ¶ 12, citing *Cleveland v. Cleveland Elec. Illum. Co.*, 115 Ohio App.3d 1, 12, 684 N.E.2d 343 (8th Dist.1996). The right to injunctive relief must be established by clear and convincing

evidence. *Kyrkos*, citing *Zavakos v. Zavakos Ents., Inc.*, 63 Ohio App.3d 100, 103, 577 N.E.2d 1170 (2d Dist. 1989).

{¶23} In determining whether to grant injunctive relief, no one of the four preliminary injunction factors is dispositive; rather, the four factors must be balanced with "'flexibility which traditionally has characterized the law of equity.'" *Cleveland Elec. Illum. Co.* at 14, quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982). For instance, where there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though a plaintiff's case of irreparable injury may be weak. *Id.* Conversely, where a party's likelihood of success on the merits is low, there must be a high likelihood of irreparable harm to justify injunctive relief. "[W]hat plaintiff must show as to the degree of irreparable harm varies inversely with what plaintiff demonstrates as to its likelihood of success on the merits." *Id.*

{¶24} In Ohio, where an administrative agency issues an RFP, the agency is bound to follow the "conditions and provisions it had itself set forth in the RFP." *Danis Clarkco Landfill Co.*, 73 Ohio St.3d at 603, 653 N.E.2d 646 (1995). The agency's substantial compliance with the RFP is sufficient. *Id.* at 604. And when an award decision is based upon the criteria expressly outlined in the bidding proposal, the agency has not abused its discretion. *Id.* The trial court must refrain from substituting its judgment for the agency's discretion. *Id.* at 605. Additionally, there must be evidence the agency acted in bad faith in order to establish fraud. *Id.*

{¶25} Moreover, administrative agencies have wide discretion in selecting recipients for its funding. *Psych. Emergency Evaluation v. Cuyahoga Mental Health Bd.*, 8th Dist. Cuyahoga No. 44497, 1982 Ohio App. LEXIS 11687, 12 (May 20, 1982). "Courts cannot and should not

substitute their judgment for duly constituted agencies of the executive branch whose authority is expressly derived from legislative enactment." *Id.* at 20.

### A. Likelihood of Success

**{¶26}** The trial court found that AIDS Taskforce failed to prove a substantial likelihood of success on the merits of its claim that ODH abused its discretion in denying the Taskforce's application for Part B funding. In so doing, the court rejected the Taskforce's contention that ODH failed to comply with its own RFP. Specifically, the trial court found that ODH focused on two RFP criteria: completeness of the application and "past performance related to programmatic and financial stewardship of grant funds." The trial court identified several problems with the Taskforce's application: a missing nonmedical work plan; a late audit report; late monthly expenditure reports; issues with caseload sizes/inequality of caseloads; and an untimely submitted plan of correction. The trial court therefore concluded that AIDS Taskforce failed to establish clear and convincing evidence that ODH failed to follow its RFP criteria, and there was no evidence that ODH abused its discretion in denying the application.

**{¶27}** The RFP for Ryan White, Part B funds for the most recent competitive grant cycle identified certain criteria by which applications would be judged, including "acceptable past performance in areas related to programmatic and financial stewardship of grant funds" and "compliance to [Ohio Grants Administration Policies and Procedures Manual ("OGAPP")]." Section C1.3 of the OGAPP provides that all applications for funding will be judged on "quality, clarity, and completeness of the application," and ODH "reserves the right to reject any or all applications for any given Solicitation" and its decision is final, because "there is no appeals process after the decision has been made."

**{¶28}** The grant application and all required attachments were due December 19, 2016. The attachments included a nonmedical case management work plan (when requesting this position).

**{¶29}** On January 26, 2017, Laurie Rickert, ODH's health granting administrator, issued a memorandum to ODH's Director, Richard Hodges, stating that the program "is recommending the department no longer fund the AIDS Taskforce * * * due to an extensive history of concerns." The memorandum stated that the Taskforce "has been a long-standing concern" for ODH, and it outlined its history of concern, beginning with the 2014 competitive grant cycles, where ODH placed the Taskforce on probation due to its financial insolvency. The memorandum also noted that throughout the course of the following year, the Taskforce failed to timely submit its audit report, failed to submit the report with its continued application, submitted a number of untimely monthly expense reports, did not successfully resolve "special conditions" until the start of the grant year, and failed to address its financial insolvency. Once again, at its combined application review ("CAR") meeting in 2016, Rickert noted that the previous concerns were discussed, and despite the proposal that the Taskforce not be funded "due to the history of poor grant compliance and late submission of documents," the Taskforce was again placed on probation and directed to create a plan of correction ("POC").

**{¶30}** Finally, in addressing the present situation, Rickert stated in her memorandum that following the CAR meeting on January 20, 2017, ODH made the decision to not fund the Taskforce during this most recent grant cycle. The reasons included: (1) caseload size still inequitably distributed (discussed in the POC); (2) following a programmatic monitoring visit in October 2016, the Taskforce was required to provide a POC by December 9, 2016, and as the date of the memorandum, it had not submitted the POC; (3) as of the date of the memorandum,

the Taskforce had not responded to several "checklist" items identified at the monitoring visit; (4) the Taskforce failed to submit "cleaned up data tables"; and (5) despite the request for a nonmedical case manager, the Taskforce failed to submit the work plan for this position.

{¶31} During the injunction hearing, LaRaun Clayton, AIDS Taskforce's executive director, conceded that the Taskforce's application was incomplete. Clayton testified that the application did not include the POC. Rather than filing the POC by December 9, as required, or by December 16, when the Taskforce filed the grant application, the Taskforce submitted the POC one business day prior to the injunction hearing. Clayton explained that although the Taskforce was aware that the monitoring meeting occurred and the POC was due December 9, the Taskforce's failure to submit a POC was an "oversight." In acknowledging receipt of a letter from ODH's Melissa Kuhn regarding the case management clinical monitoring visit during which the ODH discovered three issues, or "findings," requiring corrective action, Clayton stated:

> I was on my honeymoon initially when the email [from Kuhn] first came through. And by the time I returned, we had two major proposals due, Part B being one of them, and also a Ryan White Part A grant. And we were in full proposal mode. I remember sending an email let us not let this fall off the radar, but really focusing on making sure we were going to get those proposals in with limited staff. That kind of became the focus, and it was an oversight.

Clayton also acknowledged that the Taskforce did not include the nonmedical case manager work plan in its application, acknowledging that the Taskforce could have completed the work-plan template contained within the RFP. Clayton maintained that the failure to include this paperwork was also an oversight.

{¶32} AIDS Taskforce contends that the trial court failed to consider federal law in analyzing the Taskforce's likelihood of success on the merits. We disagree. In its analysis of

the Taskforce's likelihood of success, the trial court noted that pursuant to 45 C.F.R. 75.207, ODH may "place terms and conditions on subawards as a result of noncompliance." This section of the code, entitled "Specific award conditions," provides that a pass-through entity "may impose additional specific award conditions as needed * * * [w]hen an applicant or recipient has a history of failure to comply with the general or specific terms and conditions of a federal award." 45 C.F.R. 75.207.

{¶33} The trial court also cited to 45 C.F.R. 75.371 in noting ODH's discretion to terminate a subaward after determining the subawardee's noncompliance cannot be remedied. This code section addresses the remedies available for noncompliance if the pass-through entity "determines that noncompliance cannot be remedied by imposing additional conditions" and provides that an awarding agency may "[w]holly or partly suspend * * * or terminate the Federal award." 45 C.F.R. 75.371. The trial court stated that the evidence demonstrated ODH "worked with [the Taskforce] and gave them technical/programmatic assistance," as required. However, despite this assistance and the fact that the Taskforce "corrected some of its compliance issues," the Taskforce ultimately failed to "appropriately notify ODH in a timely manner before ODH made the granting decision," and at the time ODH evaluated the grant applications, ODH "still found areas of noncompliance," namely an incomplete application and "programmatic" compliance history. The trial court noted that as of March 1, 2017, when ODH had made the granting decision, the Taskforce had yet to submit its POC, and the Taskforce had not complied with its April 2016 POC concerning the case load imbalance. Thus, the trial court essentially concluded that AIDS Taskforce's noncompliance could not be remedied by imposing additional conditions.

{¶34} We note, however, that ODH argues it did not terminate the Taskforce's award, and therefore, 45 C.F.R. 75.371 does not apply. The code defines "termination" as "the ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." 45 C.F.R. 75.2. Rickert testified that although the Ryan White Part B manual allows the termination of a contract as a last resort, the ODH did not terminate the contract. Rather, it "did not choose to fund them in a competitive grant cycle." The evidence shows that the Taskforce was permitted to complete the grant for the 2014-2017 grant cycle, but it was denied funding for the next grant cycle, 2017-2020. Thus, ODH did not terminate the Taskforce's award when it denied the Taskforce's application in this case; rather, it exercised its discretion in denying the Taskforce's request for future funding.

{¶35} AIDS Taskforce also contends that it was subject to disparate treatment, and the ODH's reasons for denying the Taskforce's application — compliance issues — was a mere pretext for ODH to defund the Taskforce and accomplish its goal of establishing one state-wide AIDS service organization. In support, the Taskforce argues that the same errors purportedly committed by AIDS Taskforce were also committed by Nueva Luz and Equitas, yet only the Taskforce was denied funding.[2]

{¶36} ODH contends, however, that the entities at issue are not similarly situated, and the Taskforce's errors and omissions were more egregious than the errors of the appellee entities. The evidence supports ODH's argument.

{¶37} AIDS Taskforce applied for Part B funding for the northeast Ohio region. ODH awarded the Part B funds to two entities likewise serving northeast Ohio: MetroHealth and Nueva Luz. However, as Laurie Rickert testified, although Equitas is the largest provider of

Part B services in Ohio, it was not awarded Part B funding for performing services in northeast Ohio for this current grant cycle. According to Rickert, ODH increased Equitas' Part B funding from the prior grant cycle due to the increased caseloads in other parts of Ohio outside the northeast region and Equitas' funding was "unrelated to what was happening in northeast Ohio."

{¶38} Rickert also testified concerning the process by which applications for funding are reviewed. Part of that process includes an evaluation during which ODH's team of reviewers assigns a numeric score to an application. An applicant must receive a minimum of 70 out of 100 points on the Grant Application Review/Rating Form to be eligible for funding. Rickert stated that AIDS Taskforce had satisfied the minimum score to be eligible for funding. However, the evidence shows that the Taskforce received an average score of 81.7, the lowest score compared with all subrecipients of Part B funds of this current grant cycle. The average scores were noted as follows: Caracole — 98.7; MetroHealth — 98.3; Nueva Luz — 96.3; Southeast — 95; Equitas — 88.7; and AIDS Taskforce — 81.7.

{¶39} Regarding compliance issues, AIDS Taskforce submitted an incomplete application. Importantly, the application lacked the Taskforce's POC. According to the Ryan White Part B manual (exhibit No. 4, p.48), corrective action plans are an integral part of the monitoring process:

> The grantee must have a process to monitor subrecipients as well as assure that lead agencies * * * have in place a process that includes annual program and fiscal site visits to monitor their subrecipients. Grantees should require their lead agencies to annually submit required federal audits, monitoring reports and/or corrective action plans for their subrecipients. When problems with a subrecipient are noted, grantees or lead agencies * * * must share the findings

---

[2] AIDS Taskforce makes no similar claim concerning MetroHealth.

with the subrecipient and ensure that corrective actions are instituted and monitored.

When instances of legislative and/or programmatic noncompliance are discovered, the grantee or the grantee's lead agency * * * must share the finding with the subrecipient and ensure that a corrective action plan is established to address the finding(s). The grantee must monitor the corrective action plan to ensure its satisfactory completion.

Therefore, without a POC, the ODH was unable to ensure that its concerns with the Taskforce were satisfactorily addressed. There is no evidence that MetroHealth, Equitas, or Nueva Luz submitted an incomplete application, namely an application lacking a POC. And according to Jennifer McCauley, ODH's chief of grant services, no other agency has received funding after failing to submit a POC.

{¶40} AIDS Taskforce contends that both Nueva Luz and Equitas had other compliance issues similar to those experienced by the Taskforce. For example, the Taskforce argued that Nueva Luz submitted late A-133 audit reports in 2013, 2014, and 2015, and Equitas submitted a substantially late audit report in 2014; Nueva Luz submitted monthly expense reports late 29 times in 6 years; Equitas and Nueva Luz also had caseload inequities, with a case manager at Equitas having approximately 100 clients and three case managers at Nueva Luz each having over 100 clients; and Nueva Luz had also been referred to a CAR meeting based upon financial solvency concerns.

{¶41} As ODH asserts, and the evidence supports, the compliance concerns with the subrecipients and AIDS Taskforce differed. For example, Nueva Luz was substantially late in submitting it's a-133 audit reports in 2013 and 2014, and several days late in 2015. Kimberly

Rodas, clinical supervisor of the social workers and grant writer for Nueva Luz, attributed Nueva Luz's difficulty with submitting audit reports during that time frame to the lack of an effective controller, but once Nueva Luz hired its current controller, the issue was resolved. By contrast, AIDS Taskforce submitted untimely audit reports, by at least two months, on four occasions, without submitting extension requests. And more recently, the Taskforce's 2014 audit that was due in September 2015 was not submitted until February 2016, five months later.

{¶42} McCauley explained the importance of a timely A-133 audit report in stating that "the A-133 * * * lets us know whether or not an entity is financially sound, whether they have good internal controls, if they have had any issues throughout the year that we should necessarily be concerned about." McCauley believed that AIDS Taskforce received preferential treatment in the past in that despite the Taskforce being late with its A-133 audit report in the previous grant cycle in 2013, the Taskforce still received funding. McCauley provided that "any other entity [that] was late submitting the A-133 during a competitive cycle would not have been funded. * * * [A]n entity whose A-133 was not submitted on time, [its] application is normally not even reviewed, so there is no consideration for funding."

{¶43} Regarding monthly expenditure reports, the Taskforce argued that Nueva Luz submitted several late reports in 2011, 2012, and 2013. However, Nueva Luz was not late with any expenditure reports in 2014, 2015, and 2016. The Taskforce, on the other hand, was late five times in 2015 and 2016. Rickert testified that in the most recent grant cycle, no other agency had the same type of billing issues as the Taskforce.

{¶44} AIDS Taskforce also contends that Equitas and Nueva Luz had caseload inequities similar to the Taskforce. For example, during 2016, the Taskforce had one case manager with approximately 100 clients, and Equitas and Nueva Luz also had case managers who each had

approximately 100 clients assigned. According to Rickert, the RFP identifies the recommended caseload as between 50 and 75 cases. The difference between agency caseload, however, is that the Taskforce's one case manager had approximately one-third of the Taskforce's 301 clients, with the remaining cases being assigned among the other six case managers. And in April 2016, ODH ordered the Taskforce to submit a corrective action plan to address the inequity of caseloads within its agency. Despite having agreed to reassign case managers in order to equalize the caseloads, the Taskforce's executive director admitted that when the Taskforce applied for Part B funding in December 2016, that same case manager still had approximately one-third of the Taskforce's caseload.

{¶45} Nueva Luz, however, has three case managers and each one of the case managers is handling a large, but relatively equal, case load — with 119, 139, and 145 clients. The agency's clinical supervisor explained that with the Part B funds they had been awarded, but which are on hold during this litigation, they had planned to hire four additional case managers to assist with this large caseload.

{¶46} The Taskforce alleges that Nueva Luz had twice been referred to a CAR meeting based upon financial solvency concerns, yet it was not denied funding. McCauley noted that if the reason an agency is "brought in for a CAR meeting" is for "something substantial, they may only be brought once to CAR. The second time around, they may not be funded. If it's something minor, it could be two times." McCauley stated that AIDS Taskforce has been referred to a CAR meeting every year since 2011. According to McCauley, however, no other agency (other than the Taskforce) has been referred to more than three CAR meetings and still received funding.

**{¶47}** Both McCauley and Rickert testified regarding how CAR meetings, which they likened to being on probation, affected ODH's decision to deny the Taskforce's funding. Rickert explained as follows:

> [W]e have a three-year cycle. The first year is competitive and the next two are probation. So the 2014, 2015 grant years began, the past three-year cycle, they were placed on probation. They were given stipulations during that probation that if they didn't meet all of the criteria they would lose their funding at that point. At that point they were financially struggling, and they had a number of very serious issues. The recommendation had been at that time to not fund them, but instead we placed them on probation.
>
> The final stipulation of that probation was to re-compete for their funds in the second year. They did that, and they were awarded their grant funds. That year they had no plan of correction or probationary actions hanging over them. That's when we began to see them slip again as far as late monthly expense reports and things like that.
>
> So the director sent them a letter in February of 2016, approaching the last year of the grant cycle, the one that just ended. At that point they were again told they were placed on plan of correction and given a whole list of items of things that they would have to be responsive to.
>
> Some of those items had improved, but more items grew. So as items are checked off the list, more items grew, like the monitoring visit, not submitting a plan of correction and not submitting the checklist items and not equalizing their caseload, things like that. So most of our subgrantees know in a competitive cycle there are no guarantees. There's no guarantee you will be funded in a competitive cycle. So when they re-competed, they again forgot a requirement on the grant application, which had just become a pattern for this agency over the years. So the decision was made to cease their funding at that point.

Thus, the Taskforce cannot establish it was the victim of disparate treatment among the agencies.

**{¶48}** AIDS Taskforce's argument that "compliance issues" was a pretext for denying the Taskforce's funding likewise fails. The Taskforce contends that ODH had an ulterior motive for denying funding: a goal of consolidating AIDS organizations under one roof. First, there is no evidence supporting the Taskforce's theory. Tracy Jones, former executive director of AIDS

Taskforce, testified concerning a conversation she had with ODH's Ryan White Part B administrator, Katherine Shumate. Jones stated that although Shumate never expressly stated that she "wanted AIDS Taskforce to go away," Jones had come away from this conversation with a "feeling" that Shumate wanted a single AIDS agency. The court sustained the objection to this irrelevant hearsay testimony. Second, Shumate testified in her deposition that was introduced as evidence at the hearing that she personally opposed the idea of having only one statewide agency for Part B funding, because "if you have something that's going wrong, it makes it very difficult to change it if all your eggs are in one basket."

{¶49} Based upon the foregoing, we find that AIDS Taskforce has failed to establish by clear and convincing evidence that there is a substantial likelihood that it would have prevailed on the merits of its claim.

## B. Irreparable Harm

{¶50} The trial court found that AIDS Taskforce did not establish clear and convincing evidence that it would suffer irreparable harm if the court declined to issue a preliminary injunction. The trial court rejected the Taskforce's argument that without the Part B grant funds, the Taskforce will lose case managers and its clients will fall out of the continuum of care, their health prospects will diminish, and this diminished health will lead to an increased HIV viral load. The trial court found that the disruption to the personal relationship a client has with his or her case manager does not rise to the level of irreparable harm and the Taskforce presented no evidence that the appellee subrecipient agencies would be incapable of providing the same level of care to the Taskforce's clients who would transfer to the other agencies. Rather, the trial court found, to the contrary, that the evidence supported the argument that Nueva Luz,

MetroHealth, and Equitas are "fully capable agencies that can administer Part B medical case management programs."

**{¶51}** AIDS Taskforce asserts that it is the only "one-stop shop" service provider in northeast Ohio for persons living with HIV/AIDS, serving the sickest and most vulnerable among us. The Taskforce states that it is the longest-tenured AIDS service organization in Ohio, whose clients are predominantly low-income and African-American residing in the greater Cleveland area, and many have mobility issues and would not have the ability to travel to another agency for services. Tracy Jones testified that the Taskforce's location has always been important because it is on a bus line and provides for convenient transportation for its clients. The Taskforce also asserts that a case manager is the trusted confidant who acts as a "gateway" to a client's treatment and care. Jones stressed the importance of the personal and long-term relationship a client has with his or her case manager when it comes to receiving HIV/AIDS services. And LaRaun Clayton testified that if a client had to go out on his or her own to look for resources, "most of them will fall out of care or not even initiate care."

**{¶52}** "Irreparable harm" is an injury "'for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete.'" *Cleveland Elec. Illum. Co.*, 115 Ohio App.3d at 12-13, 684 N.E.2d 343, quoting *Ohio Turnpike Comm. v. Texaco*, 35 Ohio Misc. 99, 105, 297 N.E.2d 557 (C.P.1973). Irreparable harm "depends upon the context" in each case. *Cleveland Elec. Illum. Co.*

**{¶53}** As the trial court found in this case, the evidence demonstrates that other agencies are willing and able to provide the same level of care and services to HIV/AIDS patients in the

community as previously provided by AIDS Taskforce, including those who may transfer from the Taskforce.

{¶54} Kimberly Rodas testified that she and her husband opened Nueva Luz in 1999, almost two decades ago. The agency provides case management, prevention, and education services. Rodas and her husband saw the need for housing, nutrition, and legal services, so they added the relevant programs. While offering "an array of services," Rodas stated that they intentionally do not refer to themselves as a "one-stop shop" because they "look to [their community] partners who are experts in other fields" when the need arises. Rodas stated that Nueva Luz has "linkage agreements" with other organizations, such as MetroHealth, St. Augustine, Catholic Charities, Care Alliance, Cleveland Clinic, all the area hospitals, and the Free Clinic. So, for example, if they have a client with substance abuse issues, they work with Recovery Resources or Catholic Charities. Nueva Luz, in turn, provides assistance to other agencies, such as AIDS Taskforce and MetroHealth, because Nueva Luz has legal service providers and the other agencies do not.

{¶55} MetroHealth's Mark Lehman echoed Rodas's sentiment, stating that MetroHealth provides a multitude of services to its clients, and when clients require a service it does not provide, such as housing or a food pantry, it refers its clients to those organizations that can help. Lehman testified that MetroHealth provides all of the same services as AIDS Taskforce, with the exception of a food pantry and housing case management. And when a client requires a food pantry, for example, MetroHealth refers that client to the Taskforce.

{¶56} Rodas further testified that while Nueva Luz began as an organization largely serving the Hispanic population, the agency provides services to a diverse population, which includes Hispanic (25%) and African-American or nonHispanic (72%). Nueva Luz has a

diverse bilingual, bicultural staff. And although the agency office is located in the Cudell neighborhood, which Rodas identified as the highest incidence of HIV on the west side, it services clients "from all over the area of greater Cleveland," including Lorain, where the agency has another office. Rodas stated that the agency is located on a bus line for client convenience, and when needed, case managers conduct home visits anywhere within a five county radius, which includes Cuyahoga, Geauga, Ashtabula, Lake, and Lorain counties. Rodas stated that Nueva Luz "[doesn't] turn anyone away."

{¶57} MetroHealth also submits that it serves everyone in the community, including the Latino and African-American community. Lehman testified that they work efficiently in accommodating varied schedules, including employing staff who work ten-hour days and move around their schedule to accommodate people who cannot come to the office during regular business hours.

{¶58} AIDS Taskforce submits that its clients are personally vested with their case managers and seeing a different case manager presents a hardship on the clients. LaRaun Clayton conceded, however, that there are occasions where case managers become otherwise unavailable, either through illness, a change in jobs, or death, and while perhaps initially stressful to the client, the change is unavoidable. Rodas testified that Nueva Luz exercises a team approach to case management. She explained that exposing clients to a team of case managers (where several case managers work with each client) eliminates the wait for a particular case manager and addresses case manager absence. Rodas also provided that licensed social workers are trained to work with people going through difficult situations, such as a change in case management:

[W]e're trained to work with folks who are going through difficult situations. We are trained to work with people who are going through transition. It's not to minimize what they are going through at any point. But as professionals, that's part of our — what we were trained to do. So I mean, if — I see it in my head. Like you assess, you plan, you this, you this. And you have to know all those steps to even become licensed. So it's a component of what we do every single day, and I feel like any licensed social worker should be equipped to help somebody through a transition.

{¶59} ODH's Laurie Rickert testified that ODH assists defunded agencies in transitioning clients to new providers by "running reports for them so they knew what the caseloads would be and who the case managers were that would work with the clients to get them transitioned." When questioned on cross-examination whether "shifting patients between case managers can negatively impact the continuity of care on the patients," Rickert stated that transitions can be successful:

Clients can certainly transition with the assistance of their case manager if they are walked through the system. In a lot of cases, the clients with the Taskforce had been there for years, and so they are probably familiar with the other case managers. So I think it can be done successfully.

{¶60} Rickert noted that the success of a transition, however, often depends upon the cooperation of the agency that loses its funding and whether that agency "is amenable to helping with the transition." Rickert also explained that if clients chose not to go to a new provider, they are not necessarily falling out of care, as "[t]heir medical care wasn't changing. The case management was changing." Regarding AIDS Taskforce, Rickert testified that ODH is willing to assist the Taskforce with transitioning, and she has, in fact, contacted Clayton to discuss a transition plan.

**{¶61}** AIDS Taskforce asserts that the trial court failed to consider evidence that the Taskforce's clients were not being absorbed by the other agencies. The Taskforce states that ODH awarded the Part B funds that AIDS Taskforce had been denied to the other providers under the assumption that those providers would service former Taskforce clients. The Taskforce argues that because the majority of its clients were remaining with the Taskforce and the Taskforce will continue to provide case management services that would be covered by the Part B funds at issue, there is no reason why the other providers should receive the Part B funds, because those newly awarded funds would go unused.[3] The evidence does not support AIDS Taskforce's argument.

**{¶62}** According to the RFP, the Part B grant funds at issue here would cover some administrative expenses and the salaries of the agency's case managers. The RFP required the applicant to identify the salaries, and it included recommended levels of funding. Tonya Simmons, the Taskforce's Director of Finance, testified that with this grant, the Taskforce would first incur expenses for the program and then seek reimbursement by submitting invoices to ODH. McCauley confirmed that an agency would submit an expenditure report based upon its last approved budget revision, and once the agency submits its report, "that's basically their invoice for payment," and it allows ODH to know how the grant money is being spent. Rickert testified that due to AIDS Taskforce not being funded, ODH allocated additional case management positions to other providers in order to offset the increase of clients who would transfer from AIDS Taskforce. She stated, however, that if "caseloads do not show the need for that number of positions, we would have to take them back."

---

[3] Tracy Jones testified that the Taskforce is "incur[ring] debt" to the AIDS Healthcare Foundation in order to continue providing Part B services during this litigation. Jones provided that the Taskforce intends to reimburse the AIDS Healthcare Foundation upon its successful litigation.

{¶63} The evidence does not support the Taskforce's argument that these additional Part B funds would go "unused" by other providers. As previously discussed, Rodas testified that Nueva Luz was intending to hire four additional case managers with the Part B funding. Recently, Nueva Luz relinquished a Part A case manager to assist with clients on the east side of Cleveland, so Rodas's hope was to "equalize the [case]load" within Nueva Luz in light of this shift in case managers with the additional staff. And presently, Nueva Luz's Part B case managers each carry a caseload that far exceeds the recommended number of clients. Additionally, Rickert testified that ODH's decision to shift three additional case managers to Equitas reflected that agency's needs in other parts of the state and bore no relationship to the needs of northeast Ohio.

{¶64} Moreover, while the temporary restraining order was in place, the Taskforce continued to enroll new clients and re-enroll existing clients (as all existing clients must re-enroll every six months). During this time, its clients continued to receive Part B services. However, once the trial court denied the Taskforce's injunction, it could no longer access ODH's computer system for enrollment purposes. And according to ODH, those clients who were not re-enrolled by the time their application expired at the end of April are not currently part of the Ryan White Part B program. We cannot presume, given the clients' current status, that those same clients would continue to refuse to seek out other providers even if it meant the loss of their health care services.

{¶65} In light of the above, we find that AIDS Taskforce has not established irreparable harm should the injunction be granted. While a change in case managers is arguably upsetting to a client currently receiving case management through the Taskforce, the disruption in the relationship between client and case manager does not rise to the level of irreparable harm.

Other local agencies are demonstrably available to provide comparable Part B medical case management services to the Taskforce's clients upon transfer, and ODH and the other new providers are willing to provide assistance to ensure a successful transfer.

### C. Harm to Third Parties and Public Interest

{¶66} The trial court found that the Taskforce failed to provide clear and convincing evidence that third parties will not be unjustifiably harmed should the injunction be granted. In so finding, the trial court identified the harm incurred by other Part B services providers, including Nueva Luz, MetroHealth, and Equitas. The court noted that Nueva Luz was prevented from hiring additional case managers to assist its currently understaffed agency, and the agency had recently begun a plan for a program expansion that included renovating office space and leasing new office equipment to update its technology. Rodas testified that in anticipation of receiving Part B funds, Nueva Luz had also offered employment to new case managers, one of whom is bilingual. The offers, however, had to be rescinded.

{¶67} AIDS Taskforce objects to the trial court's consideration of the harm to Nueva Luz, MetroHealth, and Equitas, arguing that the agencies are party defendants, not third-parties, and the inconvenience incurred by the agencies is subordinate to the harm its clients will suffer without an injunction. However, the trial court also considered the harm to the clients these agencies serve. For example, Part B funds allocated to Equitas were to serve HIV/AIDS patients in other Ohio counties where the Taskforce does not provide services. And as the trial court stated, and all parties will undoubtedly agree, "this case is about * * * the sickest and most vulnerable among us [and] [t]he public interest in * * * providing a timely resolution in matters affecting patient HIV/AIDS care is obvious." The "sickest and most vulnerable" include those individuals receiving case management from other providers.

**{¶68}** The trial court found that the public interest weighs in favor of denying the injunction. The court determined that a competitive bidding process for each grant cycle "ensures that agencies provide quality medical services to HIV/AIDS patients" and it is "in the public interest for ODH to have a competitive bidding process to ensure the funds are going to qualified agencies that are able to provide care and support services to people living with HIV/AIDS."

**{¶69}** As part of this competitive bidding process, ODH determined that AIDS Taskforce had not complied with its RFP in applying for Part B funds. It therefore exercised its discretion and denied the Taskforce's application and awarded Part B funds to Nueva Luz, MetroHealth, and Equitas. These funds would provide case management services to its clients, who, like the Taskforce's clients, are also individuals living with HIV/AIDS. An injunction would prevent those funds from being utilized towards the efficient administration of patient care and may cause funding to lapse. Undoubtedly, it is not in the public interest for those suffering with HIV/AIDS to be without services provided by the Part B program, regardless of the source of case management. On balance, the injury to the Taskforce does not outweigh any potential injury to HIV/AIDS patients and the community-at-large, particularly considering that the Taskforce's clients can still receive services through qualified and capable agencies such as Nueva Luz, MetroHealth, and Equitas.

## IV. Conclusion

**{¶70}** Upon review, we find that the above factors weighed in favor of denying the injunction. We therefore find the trial court did not abuse its discretion in denying AIDS Taskforce's motion for preliminary injunction.

**{¶71}** Judgment affirmed.

It is ordered that appellees recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

LARRY A. JONES, SR., J., and
KATHLEEN ANN KEOUGH, J., CONCUR
#105971