[Cite as *Twang, L.L.C. v. Cincinnati*, 2024-Ohio-6077.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| TWANG, LLC, | : | APPEAL NO. | C-230531 |
|  |  | TRIAL NO. | A-2301308 |
| Plaintiff-Appellant, | : |  |  |
| vs. | : |  |  |
|  |  | *O P I N I O N* |  |
| CITY OF CINCINNATI, | : |  |  |
| and | : |  |  |
| HAMILTON COUNTY LAND | : |  |  |
| REUTILIZATION CORPORATION | : |  |  |
| Defendants-Appellees. | : |  |  |

Civil Appeal From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: December 31, 2024

*Statman, Harris, Alan J. Statman* and *William B. Fletcher*, for Plaintiff-Appellant,

*Emily Smart Woerner,* City Solicitor, *Jon Vogt, Erica E. Faaborg* and *Monica Windholtz,* Assistant City Solicitors, for Defendant-Appellee City of Cincinnati,

*Amy Higgins* and *Kelley L. Allesee,* for Defendant-Appellee Hamilton County Land Reutilization Corporation.

**BOCK, Presiding Judge.**

{¶1} To address the danger caused by a building that defendant-appellee the City of Cincinnati ("City") considered "a direct threat to public safety," the City issued abatement notices to the owner, plaintiff-appellant Twang, LLC. Months later, the City and defendant-appellee the Hamilton County Land Reutilization Corporation ("Landbank") allowed a construction company to enter the building and begin performing work to make the building safe. Twang sued, seeking declaratory and injunctive relief. Ultimately, the trial court ruled in the City's and Landbank's favor.

{¶2} On appeal, Twang challenges the trial court's decisions (1) excluding its expert witnesses from testifying at a preliminary-injunction hearing, (2) denying its request for a preliminary injunction, and (3) granting the City's and Landbank's motions to dismiss Twang's complaint.

{¶3} First, the trial court acted within its discretion when it excluded Twang's experts from testifying at the preliminary-injunction hearing because Twang disclosed their identities to the defendants only two days before the hearing and Twang rejected the trial court's offer to continue the hearing to produce expert reports.

{¶4} Second, the trial court was within its discretion in denying Twang's request for a preliminary injunction because Twang failed to establish a likelihood that it would prevail on the merits of its claims. Twang's rights were not violated because (1) the City informed Twang of its intent to repair the building more than 30 days before beginning the repairs, (2) Twang failed to appeal the City's initial orders and notices of violation of the unsafe conditions, (3) Twang was afforded an informal predeprivation hearing with the City, and (4) the City's notices reflect emergency circumstances necessitating prompt action to ensure public safety. Moreover, the public's interest in preserving historic structures weighs against enjoining the repairs

of a building located within a historic district.

**{¶5}** Finally, Twang failed to demonstrate any error in the trial court's decision to dismiss its complaint for declaratory relief.

**{¶6}** We affirm the trial court's judgments.

## I. *Factual and Procedural History*

### A. *Complaint*

**{¶7}** This case involves real property owned by Twang at 817-819 Elm Street ("the Building") in Cincinnati. In March 2023, Twang sued the City and Landbank, seeking declaratory relief and a permanent injunction to prevent the City from repairing the Building and collecting costs for the repairs under R.C. 715.26 and 715.261. Twang alleged that the City provided Twang insufficient notice of its rights, which barred the City from legally performing work and recouping costs and expenses from Twang. According to Twang, any assessment of repair costs would deny Twang its "due process rights and [constitute] an unconstitutional taking of [its] property."

**{¶8}** Twang also sought a preliminary injunction and a temporary restraining order to enjoin the City during the lawsuit.

#### 1. October and November 2022 notices

**{¶9}** Twang attached numerous documents and emails to its complaint, including an October 2022 letter from the City to Twang's counsel and Heidi Kloos, Twang's owner. That letter informed Twang of the City's plan to abate "the unsafe and structurally defective conditions at 817-819 Elm Street [] under its authority under R.C. 715.26 and 715.261." Twang's counsel alerted the City that the letter was not addressed to the record owner of the property. In November 2022, the City forwarded the letter to Twang, Twang's manager, Michael Story, and Twang's agent for service. In response, Twang acknowledged "that any possible deficiency has been cured."

3

**{¶10}** The notices informed Twang that it had "failed to provide for any maintenance despite the City issuing orders identifying myriad [sic] code violations and hazardous conditions" that were "outstanding since 2016." The City relied on a 2022 report ("Hahn Report") authored by Robin Hahn, an engineer hired by Twang in 2018 and 2022 to inspect the Building. Twang attached the Hahn Report and the City's November 2022 notice to its complaint.

**{¶11}** In 2018, Hahn found that the Building "presents a hazard to the public if left unattended due to the concern of portions falling in severe weather." Hahn's 2022 inspection led him to conclude that the Building had "further deteriorated" and, at a minimum, "[t]he four sides of the property should be barricaded to prevent the public from being hurt from the threat of falling debris."

**{¶12}** The City's notices informed Twang that the Hahn "report identifies that the owners have neglected [the Building] and that its current conditions presents [sic] a direct threat to the public safety." The City planned to take "swift action" because Twang failed to deliver on its "promise to take steps to protect innocent passersby from the [Building] during [a] June 15, 2022 meeting and subsequent inspection with the City's Chief Building Official." The City determined that the "continued deterioration of the [Building] without any movement from the owner to stabilize it requires this urgent step to abate a serious threat of collapse of this historic structure."

### 2. The City and Twang's correspondence

**{¶13}** The complaint included emails between Twang and the City from November 2022 to March 2023. Twang repeatedly asked to see the City's repair plans and disagreed with the City's conclusions. Twang reminded the City that, "on multiple occasions," it informed the City that it preferred to demolish the Building. Twang "s[aw] no reason to expend substantial sums in an effort to make significant

4

improvements to the Building which will not result in any economic return to anyone." In December 2022, the City confirmed that "plans and projected costs do not exist."

**{¶14}** Twang attached a copy of a "Stabilization Agreement" between the City and the Landbank. Because the Building was distressed, dilapidated, and deteriorating, federal funding was secured to preserve the "historic building" and eliminate "specific conditions of blight and physical decay." The City was "willing to contribute" more than $600,000 of federal funds, which "may be subject to repayment from the proceeds of subsequent sale." The Landbank agreed to bring the Building into "compliance with Vacated Building Maintenance License ("VBML") requirements."

**{¶15}** The "Stabilization Agreement" included the VBML standards, which are codified under Cincinnati Mun.Code 1101.01-79.4. Satisfying those standards would adequately protect the Building against trespassers and "deterioration by the weather." For example, VBML standards require "interior floors, walking surfaces, and stairs [to be] structurally sound, and interior walls and ceilings [must be] free of loose or hanging plaster and finishes." *See* Cincinnati Mun.Code 1101.01-79.4(4). Walls must be "plumb, free from open cracks and breaks, and rat proof." Cincinnati Mun.Code 1101.01-79.4(6). Exterior walls must be "free of holes, breaks, and loose or rotting materials." *See* Cincinnati Mun.Code 1101.01-79.4(7).

**{¶16}** In February 2023, the City emailed Twang as a "follow up" to a January 23, 2023 meeting with Twang. The City forwarded "two bids for repairs" that the Landbank had received. Twang attached a bid from Kaiker Development + Construction, which proposed $622,000 worth of repairs. The bid contained details about the proposed repairs.

**{¶17}** Later that month, the City informed Twang of its plan to proceed with the repairs. At the same time, the City reaffirmed its promise that it had made during

the January 2023 meeting to "revisit this position if and when [Twang] submit[ted] a new application to the [Historic Conservation Board]."

**{¶18}** In March 2023, Kaiker employees arrived at the Building to begin the repairs. Twang asked the City why Kaiker employees were there "with a contract to do work." The City's response cited Twang's failure to either apply to the Historic Conservation Board or stabilize its "dangerous and deteriorating property." Twang sued later that month.

### B. *Pretrial filings*

**{¶19}** The parties agreed to a temporary restraining order that halted all work on the Building through April 28, 2023. In addition, Twang moved for a preliminary injunction, and the trial court scheduled a hearing. The City moved to exclude testimony of Twang's two "recently identified" expert witnesses. The City claimed that Twang waited until two days before the hearing to disclose those experts to the City, failed to send expert reports, and failed to send one expert's resume.

**{¶20}** Before the preliminary-injunction hearing, the trial court heard arguments about Twang's experts. It granted the motion in limine and excluded Twang's experts' testimony.

### C. *Preliminary-injunction hearing*

**{¶21}** Twang's owner, Heidi Kloos, testified that Twang had purchased the property in 2014 as part of her vision to build a childhood education center and low-income housing for the Cincinnati community. She knew when Twang purchased the property that the Building was vacant, "in bad shape," and in the City's Ninth Street Historic District. It was in a "generally deteriorated shape" in 2014 and "must have" worsened. It is "at least structurally deficient." Kloos concluded, after consulting with engineers and architects, that repairing the Building was futile.

**{¶22}** Kloos acknowledged that, from 2016 to 2018, Twang received civil citations for building code violations and orders from the City to barricade the Building, keep it vacant, and take certain remedial steps to secure a VBML. Those citations and orders are in the record and informed Twang of its "right to appeal" the City's orders. Twang "made the decision . . . on the basis of experts that this is not economically feasible and that there is a better way or that there might be better ways to protect the city." In 2018, Twang requested a "Certificate of Appropriateness" from the Historic Conservation Board to demolish the Building. That request was denied.

**{¶23}** Michael Story, Twang's manager, testified that Twang had barricaded the Building and had taken some steps to secure open windows and damage to the Building from a car crash. Twang has also locked the Building to prevent trespassers from entering. But as for the VBML, the cost "far exceeded any kind of economic recovery" and Twang "did not do it." Story and Kloos both testified that repairing the Building "will not have an economic return."

**{¶24}** Story met with the City in June 2022 and thought the City's walkthrough later that month was an "inspection." But the City did not produce a report following its walkthrough, and Story testified that he was blindsided by the City's October 2022 letter. Story testified that, beyond the structural issues, the Building lacked drywall, a continuous stairwell, "consistently even floors," plumbing, and electric wiring. And, Story explained, "If anybody wants to walk through the building, I make them sign a waiver." Allowing the City to move forward with its plan to repair the Building and assess costs, which could result in a lien and forced sale of the Building, would result in "a financial hardship" for Twang as its investment would be lost.

**{¶25}** Art Dahlberg, the City's Director of Buildings and Inspections, met with Twang in spring 2022. Twang asked Dahlberg to evaluate the Building's emergency-

order status to bypass Twang having to apply to the Historic Conservation Board for permission to demolish the Building. While his June 2022 inspection revealed "a lot of structural deficiencies" and Twang's failure to protect against "intrusion and weather conditions," he determined that the structural deficiencies might not require an emergency demolition. He concluded that, while the Building "was a serious hazard," it did not constitute "an emergency condition." The evidence includes pictures of the Building's interior taken during the June 2022 inspection, showing a "wavy and dipping and failing" floor with a failing substructure, a brick wall failing above a window, and water-damaged lumber, among other issues. He described the deleterious effects of cold weather on masonry and believed that stabilizing the property was necessary to preserve the Building and prevent further deterioration.

**{¶26}** Twang has taken no steps to barricade the Building or prevent the public from walking on the nearby sidewalks, though no part of the Building had fallen onto the sidewalks. When the City perceives "eminent peril of something falling off" of a building, it instructs the building's owner to take action, and if the owner fails to do so, the City will barricade the building. The City received the Hahn Report in June 2022, but did not barricade the Building in the ensuing weeks.

**{¶27}** Dahlberg explained that before any repairs, "plans would need to be submitted" and "[p]ermits would need to be issued" to authorize any construction. The City had not issued any permits and Dahlberg was unaware of any finalized plans. The "Stabilization Agreement," however, was designed to repair the Building's issues and prevent decay. But, Dahlberg testified, Kaiker had no access to the Building and was unable to draft and submit repair plans as part of its permit applications. Drafting plans for a permit application required a "structural analysis, structural details of the elements that failed, how they are going to be rebuilt, drawing that detail out how the

8

masonry is being reestablished, some information on the soil capacity of the soil below the building."

**{¶28}** James Brunner, the City's Assistant Supervisor of Inspections, is a licensed inspector. He worked on the Building from 2018 to 2022 and took part in the June 2022 walkthrough of the Building. Brunner concluded that Twang had neglected the Building and allowed it to degrade into a state that will "require additional extensive repairs from when my first inspection was." He concluded, based on his walkthrough and experience with the Building, that it could be saved.

### D. *The trial court denied the preliminary injunction*

**{¶29}** The trial court denied Twang's motion at the hearing because Twang failed to show both a likelihood of success on the merits and irreparable harm. First, Twang had been on notice "since at least October . . . that the City's plan is to move forward with abatement of the unsafe and structurally defective conditions of 819 Elm." The City's actions were a result of Twang's noncompliance with City orders dating back to August 2016, which were still outstanding.

**{¶30}** The trial court determined that the Building was unsafe, citing Twang's requirement that visitors sign waivers before entering the Building and the Hahn Report's conclusion that the Building's condition "was a direct threat to public safety." Plus, it was clear that "the floor is caving in," windows were unbarricaded, and the masonry was collapsing.

**{¶31}** Turning to irreparable harm, the trial court acknowledged the uncertainty surrounding the repair costs, but concluded that "it's monetary damages" and "not irreparable harm." In its entry, the trial court explained that "Twang may be irreparable [sic] benefitted by the [City's] actions." Its injury "amounts to no more than a monetary one." Plus, Twang wanted to demolish the property, so "there is no

irreparable harm associated with the unique nature of real property in this case."

{¶32} The trial court also found that third-party considerations weighed against Twang's wishes. The Hahn Report indicated that the Building was dangerous, so the court refused to enjoin the City "from taking steps that may protect third-parties from injury resulting from the condition of the [Building]." As for the public's interest, the trial court determined that Twang did not raise a constitutional challenge to R.C. 715.26 or 715.261 and failed to show "that the public interest will be served by enjoining [a] violation of its constitutional rights."

### E. *The trial court granted the motions to dismiss*

{¶33} The City and Landbank moved to dismiss Twang's complaint. Following oral argument, the trial court granted the motions. It recited the history of the Building and Twang's complaint and found that no real controversy exists regarding whether the Building contained unsafe conditions, bringing the Building under the City's authority under R.C. 715.26. The trial court found that the City had complied with R.C. 715.26(B)'s notice requirements. It explained Twang had failed to allege that R.C. 715.26 or 716.251 violates Twang's right to due process on their face or as applied to Twang. It also determined that any due-process claim seemed "tenuous at best" considering the then eight-years negotiation between Twang and the City involving the Building's condition.

## II. *Analysis*

{¶34} On appeal, Twang raises three assignments of error. First, it argues that the trial court should have allowed its expert witnesses to testify at the hearing. Second, it claims that the trial court erroneously denied its motion for a preliminary injunction because Twang established a likelihood of success on the merits, the repairs and costs would constitute irreparable harm, and there was no evidence of public

harm. Third, it maintains that the trial court erroneously dismissed the complaint and erroneously found that the City did not violate its right to due process when it failed to afford Twang the opportunity to be heard.

### A. *The trial court reasonably excluded testimony of expert witnesses identified two days before the hearing*

**{¶35}** Twang argues that the trial court improperly deprived it of the opportunity to present expert testimony about the Building's condition and irreparable harm.

**{¶36}** We pause to remind parties that briefs, governed by App.R. 16 and Loc.R. 16.1, must include "legal and factual support for arguments." *Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.). Failing to marshal an "authority-based argument" often carries dire consequences. *See Ohiotelnet.com, Inc. v. Windstream Ohio, Inc.,* 2013-Ohio-4721, ¶ 17 (collecting Supreme Court of Ohio cases); *see also Olthaus v. Niesen,* 2023-Ohio-4710, ¶ 11 (1st Dist.); *Morrison v. Walter*s, 2022-Ohio-1740, ¶ 14 (1st Dist.); *St. Nikola Macedonian Orthodox Church v. Zoran,* 2006-Ohio-2561, ¶ 23 (9th Dist.) (collecting Ninth District cases). Twang fails to identify a standard of review and fails to cite legal authority in support of its first assignment of error beyond its argument that Civ.R. 26 and 37, rules that were not cited by the trial court, are inapplicable. *See Haldy v. Hoeffel,* 2020-Ohio-975, ¶ 35 (3d Dist.) (disregarding an assignment of error where the appellant "assert[ed] no standard of review" and failed to identify legal authority supporting appellant's position.). But the parties and the law are better served by resolving appeals on their merits, so we address the substance of Twang's arguments.

**{¶37}** A trial court has broad discretion to admit or exclude evidence, including expert testimony. *Blair v. McDonagh*, 2008-Ohio-3698, ¶ 28 (1st Dist.). To

reverse the trial court's decision to exclude expert testimony, we must find that the trial court exercised its discretion "'in an unwarranted way.'" *Stratman v. Durrani*, 2023-Ohio-3035, ¶ 13 (1st Dist.), quoting *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. Said differently, a trial court abuses its discretion when its "attitude is unreasonable, arbitrary or unconscionable." *Rummelhoff v. Rummelhoff*, 2022-Ohio-1224, ¶ 7 (1st Dist.), quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶38}** Before the trial court excluded Twang's experts, it noted that Twang had "almost a month" to prepare for the preliminary-injunction hearing, and multiple months to prepare its case. The trial court found it unfair to "spring an expert on [the City] at the last minute without an opinion, without a report, without giving them the basics of that." The trial court gave Twang three options. First, it could schedule a new preliminary-injunction hearing, arrange for one expert to see the Building, and set "a schedule for [the] expert report[s]." Second, the hearing could move forward without Twang's experts. Third, it offered to start the hearing without Twang's experts "and continue it in progress until your experts are able to give a report." Twang elected the second option to proceed with the hearing because the temporary restraining order was set to expire in two days.

**{¶39}** Twang argues that the trial court erred when it ruled that Twang should have sought expert opinions before filing the complaint. According to Twang, the trial court's decision amounted to a sanction. It maintains that Civ.R. 26(B) is inapplicable to preliminary-injunction hearings because "that rule controls overall discovery in an action." It claims that the trial court excluded its witnesses as a sanction, which was impermissible without a discovery order.

**{¶40}** Twang is correct that evidentiary rules are relaxed in preliminary-injunction hearings. Preliminary injunctions preserve "the relative positions of the

12

parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Haste is often necessary, and "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* This is why a preliminary injunction may be granted "when it appears to the court or judge by affidavit of the plaintiff, or his agent, that the plaintiff is entitled to an injunction." R.C. 2727.03; *see McVey v. Carthage Twp. Trustees,* 2005-Ohio-2869, ¶ 15 (4th Dist.). And Civ.R. 65(B)(2) contemplates using inadmissible evidence at preliminary-injunction hearings, as "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial."

{¶41} But Civ.R. 65(B)(1) requires "reasonable notice to the adverse party" before a trial court may issue a preliminary injunction. This ensures that opposing parties are afforded the "'fundamental constitutional principle' of . . . an opportunity to present evidence." *Puruczky v. Corsi*, 2018-Ohio-1335, ¶ 19 (11th Dist.), quoting *Sea Lakes, Inc. v. Sea Lakes Camping, Inc.,* 78 Ohio App.3d 472, 476 (11th Dist. 1992). A party opposing an application for a preliminary injunction "'must be accorded a legitimate opportunity to oppose the injunction.'" *Id.* at ¶ 19, quoting *Sea Lakes* at 477. A party opposing a preliminary injunction must be able to prepare its defense to effectuate that "legitimate opportunity" because "[a] hearing for which a party is unprepared is meaningless." *Id.* at ¶ 24.

{¶42} Twang informed the City of its experts' identities two days before the preliminary-injunction hearing. And Twang failed to produce expert reports. The last-minute identification of experts, without expert reports, undermined the City's ability to prepare for the preliminary-injunction hearing.

13

**{¶43}** Still more, the trial court offered to stay the preliminary-injunction hearing to give Twang's experts an opportunity to complete reports. Twang elected to proceed without its experts because the agreed temporary restraining order was set to expire within days. But temporary restraining orders may be extended for 14 days "for good cause shown," or longer if the opposing party agrees. Civ.R. 65(A). Twang could have, but did not, ask for an extension of its temporary restraining order.

**{¶44}** The trial court offered to stay the proceedings for Twang to produce expert reports, but Twang elected to proceed with the hearing. Because Twang's eleventh-hour identification of its expert witnesses deprived the City of a legitimate opportunity to oppose the preliminary injunction, the trial court did not abuse its discretion when it granted the motion in limine and excluded Twang's expert witnesses. We overrule the first assignment of error.

### B. *The trial court reasonably denied the preliminary injunction*

**{¶45}** In its second assignment of error, Twang argues that the trial court should have granted its motion for a preliminary injunction. Twang fails to identify both the standard of review for an appeal of an order denying a motion for a preliminary injunction and the factors guiding the trial court's decision.

**{¶46}** With that said, we review the trial court's decision to deny Twang's motion for a preliminary injunction for an abuse of discretion. *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC,* 2020-Ohio-6865, ¶ 16 (1st Dist.). Twang must demonstrate that the trial court's denial of its motion was an unwarranted exercise of its discretionary authority. *See Stratman*, 2023-Ohio-3035, at ¶ 13 (1st Dist.). To succeed, Twang must show that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *See City of Cincinnati v. City of Harrison*, 2010-Ohio-3430, ¶ 7 (1st Dist.). At the same time, "'courts lack the discretion to make errors of law.'" *State*

*v. Austin*, 2021-Ohio-3608, ¶ 5 (1st Dist.), quoting *Abdullah*, 2021-Ohio-3304, at ¶ 39. So, we "review legal issues decided within the injunction framework under a de novo standard." *State v. City of Cincinnati Citizen Complaint Auth.,* 2019-Ohio-5349, ¶ 21 (1st Dist.).

**{¶47}** Injunctions are "'extraordinary remed[ies,] equitable in nature, and . . . may not be demanded as a matter of strict right.'" *Vontz v. Miller*, 2016-Ohio-8477, ¶ 54 (1st Dist.), quoting *Perkins v. Quaker City,* 165 Ohio St. 120 (1956), syllabus. The party seeking a preliminary injunction carries "a substantial burden." *Connor Group v. Raney*, 2016-Ohio-2959, ¶ 17 (2d Dist.). The right to a preliminary injunction turns on "'the strength of plaintiffs' own case rather than by any weakness of that of his adversary.'" *Escape Ents., Ltd. v. Gosh Ents., Inc.,* 2005-Ohio-2637, ¶ 22 (10th Dist.), quoting *White v. Long*, 12 Ohio App.2d 136, 140 (12th Dist. 1967). Injunctive relief "depends on 'the character of the case, the particular facts involved, and factors relating to public policy and convenience.'" *Aids Taskforce of Greater Cleveland v. Ohio Dept of Health*, 2018-Ohio-2727, ¶ 19 (8th Dist.), quoting *Cementech, Inc. v. Fairlawn*, 2006-Ohio-2991, ¶ 10.

**{¶48}** The moving party must show, by clear and convincing evidence, (1) a substantial likelihood of success on the merits, (2) irreparable harm in the absence of a temporary injunction, (3) the injunction poses no risk of unjustifiable harm to third parties, and (4) the injunction serves the public's interest. *City of Cincinnati v. State*, 2024-Ohio-2425, ¶ 23 (1st Dist.), quoting *Castillo-Sang* at ¶ 16. No single factor is dispositive. *Castillo-Sang* at ¶ 16. Consistent with the law of equity, the trial court's discretionary authority lies in its flexibility when balancing these four factors. *Connor Group* at ¶ 17, quoting *Cleveland v. Cleveland Elec. Illum. Co.,* 115 Ohio App.3d 1, 14 (8th Dist. 1996).

**{¶49}** The trial court found that all four factors weighed against granting the preliminary injunction. Twang disagrees and argues that each factor supported a preliminary injunction.

1. **The trial court reasonably found that Twang failed to establish a likelihood of success on the merits of its claims**

**{¶50}** Twang argues that it showed a substantial likelihood of success on the merits of its underlying request for declaratory relief. First, Twang argues that it would prevail on its claim that the City failed to give notice of, or afford, a predeprivation hearing in violation of Twang's due-process rights. Second, it maintains that the City's October and November notices were insufficient under R.C. 715.26.

**{¶51}** The trial court's decision denying the injunction incorporated its order granting the City's and Landbank's motions to dismiss. In its order granting the motions, the trial court made two findings relevant to our analysis. First, it found that the complaint failed to "allege that R.C. 715.26(B) violates due process on its face or as applied to Twang." Second, it found that the "complaint confirms that the City complied with its statutory notice requirements under R.C. 715.26(B)."

**{¶52}** The trial court's reading of Twang's complaint is inconsistent with Ohio's notice-pleading standard and Twang's allegations. In Ohio, notice pleading requires "a short and plain statement of the claim showing that the party is entitled to relief." Civ.R. 8(A). Pleadings are "construed as to do substantial justice." Civ.R. 8(F). We have explained that notice pleading "requires neither particularity nor '"precision . . . as long as fair notice of the nature of the action is provided."'" *Hill v. Schildmeyer*, 2024-Ohio-3261, ¶ 36 (1st Dist.), quoting *Ri'Chard v. Bank of Am.*, 2020-Ohio-4688, ¶ 8 (1st Dist.), quoting *Fancher v. Fancher*, 8 Ohio App.3d 79, 83 (1st Dist. 1982).

**{¶53}** The complaint alleges that the City's notices were "insufficient to advise Twang of its rights, insufficient to permit Defendants to perform any work on the Property, and insufficient to enable Defendants to recoup any costs and expenses from Twang." Specifically, Twang alleged that its "due process rights" would be violated if the City were allowed to repair the Building and tax costs to Twang. The complaint states that the City's actions amounted to a taking of its property "through the subterfuge of stabilization without due process." Twang also alleged that the City's planned repairs exceeded its authority under R.C. 715.26 and 715.261. Twang incorporated these allegations into its first claim for relief and requested a declaration of its rights regarding the repairs to the property. The correspondence attached to the complaint include a letter from Twang informing the City that it failed to afford Twang "its due process rights to contest any actions the City intended to take."

**{¶54}** The allegations in the complaint, coupled with the correspondence from Twang, put the City on notice that Twang sought a declaration of its due-process and statutory rights under the circumstances.

**{¶55}** But that is not the end of our analysis because "a trial court may be right for the wrong reasons." *Hall v. Gill*, 108 Ohio App.3d 196, 205 (1st Dist. 1995).

**{¶56}** R.C. 715.26(B)'s notice provision conditions a municipality's authority to repair "insecure, unsafe, or structurally defective buildings" on "notice by certified mail [to the property owner] of [the municipality's] intention with respect to this or that removal or repair" provided 30 or more days before the repair. R.C. 715.26 "codifies the due process and notice requirements needed 'for the removal and repair of insecure, unsafe, or structurally defective buildings or other structures.'" *Mitchell v. City of Mansfield,* 2021-Ohio-2421, ¶ 36 (5th Dist.). The right to due process "requires that notice must be reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and to afford them an opportunity to present their objections." *City of Cincinnati v. York Masons Bldg. Assn.,* 2008-Ohio-4271, ¶ 36 (1st Dist.).

**{¶57}** The trial court reasonably found that Twang was unlikely to prevail on the merits. Beginning with Twang's statutory claim, R.C. 715.26(B) authorizes the a municipality's "removal and repair of insecure, unsafe, or structurally defective buildings." In nonemergency situations, a municipality must provide, "[a]t least thirty days prior to the removal or repair . . . notice by certified mail of its intention with respect to such removal or repair" to the property owners and any lien holders. R.C. 715.26(B).

**{¶58}** The City mistakenly failed to send the October 2022 notice to Twang, the property owner. But the City cured that defect with its November 2022 notice addressed to Twang, explaining its plan to abate the defective conditions in the Building and that the "repair of the [Building] will begin thirty days or more from the date of this notice." In fact, Twang's attorney responded to the November 2022 notice and informed the City, "[W]hile we disagree with your initial letter dated October 6, 2022 complied with the notice requirements of the statute, we acknowledge that any possible deficiency has been cured though [sic] the issuance of your November 4, 2022 letter." Considering the substance of the November 2022 notice and Twang's concession, Twang failed to establish a likelihood of success on its claim that the City's notices violated R.C. 715.26.

**{¶59}** Turning to the likelihood that Twang would prevail on its due-process claim, Twang contends that the City failed to inform Twang of its right to a predeprivation hearing to contest the City's plan to repair the Building. The notice requirement in R.C. 715.26 reflects the principle that the government must provide

18

"adequate procedural rights prior to depriving [a property owner] of [its] property interest." *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010). Due process requires a "fair process of decisionmaking when it acts to deprive a person of his possessions." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Requiring a "fair process of decisionmaking" is meant "to minimize substantively unfair or mistaken deprivations of property." *Id.* So when the government deprives a property owner of its property, the government "'must provide procedural due process consisting of notice and a meaningful opportunity to be heard.'" *Irving J. Franklin Realty, Inc. v. City of E. Cleveland*, 2023-Ohio-4419, ¶ 6 (8th Dist.), quoting *Ohio Assn. of Pub. School Emps. v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175, 176 (1994).

{¶60} A meaningful opportunity to be heard "must be granted at a time when the deprivation can still be prevented." *Fuentes* at 81. Indeed, there is "[n]o better instrument . . . for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Id.,* quoting *Joint Anti-Fascist Refugee Commt. v. McGrath*, 341 U.S. 123, 170-172 (1950) (Frankfurter, J., concurring). The law "tolerates variances in the *form* of a hearing 'appropriate to the nature of the case.'" (Emphasis in *Fuentes*.) *Id.* at 82, quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950). Generally, "whatever its form, [the] opportunity for that hearing must be provided before the deprivation at issue takes effect." *Id.* But there are exceptions to this general rule. *See Parratt v. Taylor*, 451 U.S. 527, 540 (1981) (holding that postdeprivation hearings may be justified in cases demanding prompt action).

{¶61} The hallmark of due process is flexibility, as the right "calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997), quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). When

considering what process is due, courts are reminded that "'"due process" . . . is not a technical conception with a fixed content unrelated to place, time and circumstances.'" *Id.*, quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961). The adequacy of the process provided depends on (1) "the private interest that will be affected by the official action," (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

**{¶62}** Twang has an interest in its real property. But the City has an interest in public safety, health, and welfare. *See* Cincinnati Mun.Code 1101-07.1. More specifically, the City has an interest in securing what it described in its October and November 2022 notices as "the unsafe and structurally defective conditions" that the City considered "a direct threat to the public safety." Plus, the City has an interest in preserving its historic structures and districts. *See* Cincinnati Mun.Code 1435-01-H1 (defining a "Historic District" as "an identifiable area comprised of two or more parcels and containing two or more Historic Assets typical of one or more eras in the city's history, or representing an assemblage of structures important to the city's history.").

**{¶63}** The evidence produced by Twang at the preliminary-injunction hearing proved that Twang received a letter titled, "NOTICE OF VIOLATION – VACANT BUILDING" from the City's Department of Building and Inspections in 2016, informing Twang that the Building was in violation of multiple sections of the Cincinnati Building Code. It informed Twang that it had to take "action necessary" to correct those violations and a failure by Twang "to correct the noted defects within the time specified could result in civil or criminal enforcement actions." The Building's

"exterior masonry" was "spalling" and "water damaged," and the Building was "unsafe and unsanitary." It also informed Twang of its right to appeal that order. Twang ignored the 2016 order, and the City issued six civil citations for noncompliance with its order. At no point did Twang appeal the 2016 order or civil citations. When the City sued Twang in 2018, Twang unsuccessfully sought to demolish the Building. *See City of Cincinnati v. Twang, LLC,* 2021-Ohio-4387, ¶ 8 (1st Dist.).

**{¶64}** With those orders and violations outstanding for six years, the City and Twang met in June 2022 after Twang's engineer determined that the Building had "deteriorated" and certain steps were "mandatory to protect the public." The emails attached to Twang's complaint show that Twang met with the City in January 2023, more than two months after the City gave notice to Twang of its plan to stabilize the Building. The emails demonstrate that the City and Twang discussed the City's stabilization plans for the Building and Twang's response to the City's plans. While repair plans were not finalized at this point, the "Stabilization Plan" and Hahn Report informed Twang of the City's safety and structural concerns with the Building. Twang made no repairs and elected to begin applying, for a second time, for authorization from the Historic Conservation Board to demolish the Building.

**{¶65}** In sum, Twang waived any right to a formal hearing to challenge the outstanding orders to bring the Building into compliance with the building code. It did not appeal the orders or violations. The City gave notice of its intent to repair the Building in its November 2022 notice. And the City afforded Twang an informal hearing to contest the City's actions. Under these circumstances, the informal hearing afforded to Twang was its opportunity to be heard and reduced the risk of an erroneous deprivation. Informal hearings, under the right circumstances, can satisfy due process. *See Roberts v. Girder,* 237 F. Supp.3d 548, 556 (E.D.Ky. 2017); *see also Williams v.*

21

*City of Stanford,* 533 F. Supp.3d 512, 531 (E.D.Ky. 2021); *Durham v. City of Lincoln,* 2009 Neb. App. LEXIS 147, *13 (Aug. 11, 2009).

**{¶66}** As the trial court noted, the crux of Twang's objections to the City's repairs is Twang's "desire[] to have the Property torn down" as a "more cost efficient" measure. At the hearing, it found that Twang purchased the Building, which sits in a historic district, and Twang was attempting to circumvent the building code "by allowing it to deteriorate." Twang has not explained how a formal predeprivation hearing would safeguard against an erroneous deprivation of its property rights.

**{¶67}** Plus, the notices describe the Building as "unsafe and structurally defective," "hazardous," and "present[ing] a direct threat to public safety." Due process is flexible, and "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). In fact, the United States Supreme Court has "'rejected the proposition that [due process] *always* requires the State to provide a hearing before the initial deprivation of property.'" (Emphasis in *Gilbert*.) *Id.,* quoting *Parratt*, 451 U.S. 527 at 540.

**{¶68}** This principle is reflected by the notice provision in R.C. 715.26(B), which provides that, when "an emergency exists, as determined by the municipal corporation, notice may be given other than by certified mail and less than thirty days prior to such removal or repair." In other words, "in the event of an emergency, notice is no longer mandatory; rather, it becomes discretionary." *Jackson v. City of Cleveland Dept. of Bldg. & Hous.,* 2012-Ohio-3688, ¶ 17 (8th Dist.).

**{¶69}** At the preliminary-injunction hearing, Twang stressed that the City's noncompliance with its own building code supported Twang's due-process claim. The City's justifications for the repairs reflect the conditions that amount to a "public

nuisance" under the Cincinnati Building Code. *See* Cincinnati Mun.Code 1101-57 and 1101-63.1(1)-(4). When those conditions exist, Cincinnati Mun.Code 1101-63.1 requires "written notice," and if in nonemergency situations Cincinnati Mun.Code 1101-57.2(1)-(9) requires a public hearing. If the property owner is "in disagreement with the notice and not willing to comply and where he can show substantial reasons for his disagreement," the owner may "file an appeal to the applicable board of appeals within 30 days of the date of the notice." Cincinnati Mun.Code 1101-63.1.

**{¶70}** But when "dangerous and unsafe conditions that pose an immediate danger to the public health and safety" exist on a property situated "within a designated Historic District, emergency repairs and compliance with Chapter 1435 of the Zoning Code shall be pursued in lieu of demolition whenever reasonable." Cincinnati Mun.Code 1101-63.4 and 1101-57(2). The November notice informed Twang that the Building's "continued deterioration" required an "urgent step to abate a serious threat of collapse of this historic structure." The City's notices reflect the emergency circumstances described in Cincinnati Mun.Code 1101-63.4. Those emergency circumstances were established by the evidence provided at the preliminary-injunction hearing, which included the Hahn Report and pictures of the Building's structural deterioration. Emergency demolitions under similar ordinances have not violated the due-process rights of property owners. *See City of Youngstown v. Huffman,* 2011-Ohio-4753, ¶ 39 (7th Dist.); *see also Jackson* at ¶ 22.

**{¶71}** While Twang claims that the City's delay undermines any finding of an emergency, the evidence at the preliminary-injunction hearing shows that City employees worked to secure funding for the repairs from June 2022 to October 2022. After curing its deficient October 2022 notice with its November 2022 notice, it entered into an agreement with the Landbank, fielded bids by contractors, and met

with Twang. The contractor attempted to gain entry into the Building to assess the conditions and finalize the repair plans. The City's actions do not undermine its October 2022 determination that the Building was unsafe and structurally defective, presented "a direct threat to the public safety," and posed "a serious threat of collapse."

**{¶72}** Twang emphasized the City's reservation of its right to recover costs under R.C. 715.261 as part of its claim that a predeprivation hearing is necessary to prevent a taking of its property. Under R.C. 715.261(B), the City "may collect the total cost of abatement activities" through, among other means, a lien on the property. But the "right to these costs presupposes that abatement was valid." *Turner v. City of Englewood*, 2010-Ohio-5881, ¶ 13 (2d Dist.). Twang's ability to challenge the City's collection of costs in a postdeprivation hearing satisfies due process under *Parrot*.

**{¶73}** In sum, Twang's complaint sufficed under Ohio's notice-pleading standard to allege a due-process claim, in addition to its claim under R.C. 715.26 and 715.261, as the basis for its request for declaratory relief. But Twang failed to establish a likelihood of success on the merits of its statutory claim because the City's November 2022 notice informed Twang, the property owner, of the City's plan to repair the Building 30 or more days before starting the repairs, and Twang's evidence conceded the November 2022 notice's compliance with R.C. 715.26. Twang also failed to establish a likelihood that it would prevail on its due-process claim based on the City's failure to inform or provide Twang of a predeprivation hearing. Twang failed to contest the order to repair the Building and building-code violations when it *was* afforded formal appeals to contest the City's determinations, took no action in the six years leading up to the City's determination that repairs were necessary, and was afforded an informal hearing after learning of the City's plan to repair the Building. Alternatively, due process is satisfied by the emergency circumstances reflected in the

24

City's notices, combined with Twang's ability to contest the validity of the repairs in a postdeprivation hearing.

### 2. **Twang's harm is reparable**

**{¶74}** Twang also maintains that it proved the need for an injunction to prevent irreparable harm.

**{¶75}** A party seeking injunctive relief "'must show that the injunction is necessary to prevent irreparable harm.'" *State v. City of Cincinnati Citizen Complaint Auth.*, 2019-Ohio-5349, ¶ 25 (1st Dist.), quoting *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 267 (1st Dist. 2000). Irreparable harm is "'a harm for which no plain, adequate, or complete remedy at law exists.'" *Gigsmart, Inc. v. Axlehire, Inc.,* 2023-Ohio-3807, ¶ 66 (1st Dist.), quoting *Brookville Equip. Corp. v. Cincinnati,* 2012-Ohio-3648, ¶ 23 (1st Dist.). Harm is irreparable if "the harm cannot be remedied through compensatory damages." *Id.,* quoting *Aero Fulfillment Servs., Inc. v. Tartar,* 2007-Ohio-174, ¶ 27 (1st Dist.). In other words, the party seeking a preliminary injunction must establish a threatened injury, ""'the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution would be impossible, difficult or incomplete.""" *Ohio Democratic Party v. LaRose*, 2020-Ohio-4664, ¶ 60 (10th Dist.), *Aids Taskforce*, 2018-Ohio-2727, at ¶ 52 (8th Dist.), quoting *Cleveland Elec. Illum. Co.,* 115 Ohio App.3d at 12.

**{¶76}** Here, the trial court found that "any injury resulting from [the repairs] amounts to no more than a monetary one." Plus, it found that Twang's desire to demolish the Building undermines any alleged "irreparable harm associated with the unique property in this case." We agree.

**{¶77}** Twang argues that "[e]ach parcel of real property is unique and has inherent characteristics," and it purchased the property as part of its commitment to

the neighborhood and its desire to "create a legacy." But both Twang's owner and manager testified that Twang's decision against repairing the deteriorating structure was a monetary one. Its manager testified that "the cost to acquire the VBML far exceeded any kind of economic recovery." The decision not to repair the Building "was an economic decision with the architect, construction people, investors, as far as wasting money on something." Plus, Twang's owner testified that Twang has "been trying to sell [the property]." But it did not "want to sell it at a loss." She testified that stabilizing the Building would not make the property "more valuable."

**{¶78}** Because the alleged irreparable harm was only monetary, the trial court reasonably found that Twang failed to show that a denial of its request for a preliminary injunction would result in irreparable harm.

### 3. **Third-party considerations weighed against the injunction**

**{¶79}** Third, Twang argues that the evidence, when viewed as a whole, shows that a preliminary injunction posed no risk of harm to third parties. The trial court found that the Building "is in a hazardous and dangerous condition" and refused to "enjoin the [City] from taking steps that may protect third-parties from injury resulting from the condition of the [Building]."

**{¶80}** Twang argues that the trial court's reliance on the Hahn Report ignores the other evidence in the record. It claims that the City's inaction after receiving the Hahn Report in June 2022 supports this claim. Twang appears to recognize that the Hahn Report supports the trial court's judgment, because the report warned that "[t]he time has come to put public safety to the forefront" because of the potential for falling debris and structural failure. Twang, however, cites testimony of City employees who testified that there was no emergency and the Building was not in imminent danger of collapse.

**{¶81}** Twang is correct that Dahlberg testified that the Building was a "serious hazard" but not "an emergency condition" warranting an emergency order of demolition. Specifically, he did not see that there was "immediately failing of the structural elements so that the building would be dropping in the public way or dropping onto adjoining parcels." But there was evidence that the Building was deteriorating, and both the Hahn Report and City employees warned that the continued deterioration of the Building created a danger. The Hahn Report warned in 2018 that the Building "presents a hazard to the public if left unattended." By 2022, the Hahn Report observed, the Building had "further deteriorated." The Hahn Report stated that exposure to the elements undermined the stability of a building because the freezing and thawing process destroys mortar between bricks. The photographs of the Building reflect this deterioration. Dahlberg testified that the freezing and thawing cycle accompanying changes in the seasons and weather destabilizes bricks and can cause walls to fail. Plus, there was testimony that between 2017 and 2020, bricks had fallen off the Building.

**{¶82}** The trial court reasonably found that enjoining the repairs of the Building posed a risk of harm to third parties.

### 4. The preliminary injunction was not in the public's interest

**{¶83}** Finally, the trial court found that Twang failed to show that a preliminary injunction was in the public interest.

**{¶84}** The Building sits in the City's 9th Street Historic District. The City's historic districts are designed to, among other purposes, preserve Cincinnati's history, "maintain and enhance the distinctive character of historic buildings and areas," preserving landmarks that "reflect elements of [Cincinnati]'s history, architecture, archaeology, engineering, or culture," and "maintain the historic urban fabric of the

city." Cincinnati Muni.Code 1435-03(a), (f), (g), and (l). The Historic Conservation Board's report on Twang's certificate-of-appropriateness application to demolish the Building explains that the Ninth Street Historic District "is one of the most cohesive 19th Century streetscapes in the Central Business District" and the Building itself "exhibits a relatively unaltered stone storefront and unusual semicircular frieze windows." The public's interest in preserving the Ninth Street Historic District and the architectural history reflected by the Building's exterior would not be served by enjoining the City's efforts to prevent the Building's further deterioration.

**{¶85}** The trial court reasonably concluded that all four preliminary-injunction factors weighed against granting a preliminary injunction and enjoining the City from proceeding with its repair plans. Because the trial court did not abuse its discretion, we overrule the second assignment of error.

### C. _Twang failed to show that the trial court erred when it granted the motions to dismiss_

**{¶86}** In its third assignment of error, Twang argues that the trial court erred when it granted the City's and Landbank's motions to dismiss. Twang marshals two arguments. First, it argues the merits of its due-process and statutory-violation claims. Second, it maintains that the trial court never declared its rights to due process and notice under the statute.

**{¶87}** Twang failed to identify a standard of review for its third assignment of error in its brief. Typically, we review the trial court's decision to grant a motion to dismiss de novo. _Thomas v. Othman_, 2017-Ohio-8449, ¶ 19 (1st Dist.). And typically, dismissal under Civ.R. 12(B)(6) is appropriate if "it appears beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." _Id._

**{¶88}** But Civ.R. 12(B)(6) "operates differently . . . in a declaratory judgment

28

action." *King v. Divoky*, 2018-Ohio-2280, ¶ 4 (9th Dist.). Declaratory-judgment actions are a mechanism for parties to "eliminate uncertainty regarding their legal rights and obligations." *Mid-American Fire & Cas. Co. v. Heasley,* 2007-Ohio-1248 ¶ 8. Under R.C. 2721.03, a person whose rights are

> affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

So, a complaint seeking declaratory relief under R.C. 2721.03 must establish a justiciable controversy necessitating speedy relief to preserve the rights of the parties. *M6 Motors, Inc. v. Nissan of N. Olmsted, LLC*, 2014-Ohio-2537, ¶ 19 (8th Dist.).

**{¶89}** On appeal, we review the trial court's dismissal of a declaratory-judgment action for an abuse of discretion. *One Energy Ents., LLC v. Ohio DOT*, 2019-Ohio-359, ¶ 28 (10th Dist.), citing *Heasley* at paragraph two of the syllabus. The trial court properly dismisses a complaint seeking declaratory relief if "there is (1) neither a justiciable issue nor an actual controversy between the parties requiring speedy relief, or (2) the declaratory judgment will not terminate the uncertainty or controversy." *M6 Motors, Inc.* at ¶ 19; *see Fioresi v. State Farm Mut. Auto. Ins. Co.,* 26 Ohio App.3d 203 (1st Dist. 1985).

**{¶90}** A justiciable issue exists if the "the danger or dilemma of the plaintiff [is] present, and . . . not [] contingent on the happening of a hypothetical future event." *Fulton R.R. Co. v. City of Cincinnati,* 2016-Ohio-3520, ¶ 9 (1st Dist.), citing *Heasley* at ¶ 9. An actual controversy exists when there is a "genuine dispute between parties

having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Harris v. Ohio Dept. of Veterans Servs.,* 2018-Ohio-2165, ¶ 28 (10th Dist.).

**{¶91}** The trial court found that there is no actual controversy over the condition of the Building. The trial court also found that there was no real controversy involving the application of R.C. 715.26(B)'s notice provision, and that any challenge to R.C. 715.261 was "premature and not ripe for adjudication."

**{¶92}** While Twang argues that the trial court erred when it dismissed its complaint, it fails to raise any argument challenging the trial court's finding that there existed no actual controversy. Instead, it argues the merits of its due-process and statutory claims. Appellants have the burden of affirmatively demonstrating error on appeal. *Fontain v. Sandhu,* 2021-Ohio-2750, ¶ 15 (1st Dist.). As an appellate court, we "will not create an argument in support of an assignment of error where an appellant fails to develop one." *Id.*

**{¶93}** Because Twang failed to challenge the trial court's finding that there was no actual controversy warranting a declaration of the parties' rights, we overrule Twang's third assignment of error.

### III.   *Conclusion*

**{¶94}** We overrule Twang's assignments of error and affirm the trial court's judgments.

Judgments affirmed.

CROUSE and WINKLER, JJ., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

30